(No. 11305.—Judgment affirmed.)

M. H. McGovern, Defendant in Error, *vs.* The City of Chicago, Plaintiff in Error.

*Opinion filed December 19, 1917.*

1. Pleading—*questions presented by demurrer are waived by rejoining.* A defendant waives questions presented by demurrer when he rejoins to the replication demurred to instead of standing by his demurrer, which has been overruled.

2. Municipal corporations—*a city cannot avoid contract entered into and performed pursuant to unbalanced bid.* A municipal corporation exercises a judicial discretion in accepting and rejecting bids, and where a city has advertised for bids for street repairing, announcing that no bid will be accepted which does not contain a reasonable price for every item, but nevertheless has accepted such a bid, the contract entered into and satisfactorily performed cannot be avoided by the city because the bid was unbalanced.

3. Same—*appropriation of unascertained income from license fees is a valid appropriation.* It is not essential to the validity of an appropriation of money that it shall be for an amount certainly ascertained prior to the appropriation, and an appropriation of the income from vehicle licenses for street repair work is valid.

4. Same—*there is a distinction between ultra vires contracts and contracts irregularly made.* There is a distinction between contracts which are *ultra vires* and contracts which are within the power of the city to make but which have been irregularly or illegally made, and if the latter have been performed in good faith by the contractor and the city has accepted the benefits of the work it cannot rely upon such irregularities to avoid payment.

5. Same—*when city is estopped to allege invalidity of contract for street repairing.* Where a city has advertised for bids for the repairing of pavements, has accepted a bid and entered into a contract with the bidder and the work under the contract has been satisfactorily performed by the contractor and accepted by the city, in an action by the contractor for an unpaid balance for work and materials furnished the city is estopped to allege the invalidity of the contract because the time of execution provided therein extended beyond the fiscal year for which the appropriation for such work was made, which was not according to the advertisement for bids.

Writ of Error to the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. M. L. McKinley, Judge, presiding.

Samuel A. Ettelson, Corporation Counsel, (Leon Hornstein, and Chester E. Cleveland, of counsel,) for plaintiff in error.

Benson Landon, and Robert N. Holt, for defendant in error.

Mr. Justice Craig delivered the opinion of the court:

Defendant in error, M. H. McGovern, as assignee of the M. H. McGovern Company, recovered a judgment in an action of assumpsit in the superior court of Cook county against plaintiff in error, the city of Chicago, for $114,-714.80 for work and materials furnished pursuant to a contract in writing entered into between the McGovern Company and the city to repair asphalt pavements. The declaration of the plaintiff contained three counts, with an affidavit of claim. The first two counts declared upon a contract entered into between the assignee of plaintiff and the city of Chicago. The third count consisted of the common counts. The copy of the account sued on was as follows: "To repairing 63,441.27 square yards of asphalt pavement, at $1.75 per square yard, $111,022.22; to 1593 tons of binder delivered and used in repairing said streets for the city of Chicago, at $4 per ton, $6372; total, $117,394.22."

The defendant filed a plea of the general issue, with an affidavit of merits stating that the M. H. McGovern Company was paid for all the paving work done under its contract with the city for which it was justly entitled to compensation; that the McGovern Company accepted and signed for a final voucher purporting to be and intended as a final payment for all moneys due it for asphalt paving work, for materials furnished or work performed under the contract with the city, and that there was no further money due to the McGovern Company or plaintiff. Later seven additional pleas were filed. It was alleged in the second plea (being the first additional plea) that the only promise of the defendant referred to and charged in the several counts of the declaration was a contract in writing, with specifications attached, and at the time of making said contract and the promises declared on, the defendant had not, by its city council or otherwise, made any appropriation of money for payment of the several sums so promised to be paid. The third plea was that the said contract or agreement declared upon was *ultra vires,* in that it was for a period which extended beyond the fiscal year of the city of Chicago in which it was signed. The fourth plea sets up that the contract was null and void because the same was contrary to law and ordinances of the city of Chicago, to the advertisement for bids on which the contract was based and to the specifications prepared and made a part of said contract, and was not let to the lowest bidder; that there was not a sufficient bond required of the contractor by virtue of certain sections of the municipal code then in force; that the contract did not follow or conform to the advertisement and was contrary thereto in that its terms extended beyond the period named in the advertisement, and was contrary to the specifications in that the specifications prohibited an unbalanced bid, and the agreement for the same fixed a different period and different quantities than those contained therein. The fifth plea was that under certain

ordinances of the city of Chicago set out in the plea no payment could be made on the contract declared on not specified in such contract, and no extra work could be authorized or paid for until the commissioner of public works submitted a report in writing to the city council, setting forth fully what extra work was desired, the necessity therefor and the amount of money necessary to be expended, and until the authority of the city council was first procured for such extra work and expenditure; that all of the work done under the contract declared on was paid for in full, and no extra work or authorization of expenditure for extra work was provided for in the manner required by said ordinances. The sixth plea was a plea of accord and satisfaction. The seventh plea was a plea of payment. The eighth plea was a plea of set-off.

The plaintiff replied to the second, third and fourth pleas that he ought not to be barred, because the defendant of its own wrong and without the causes in said pleas alleged broke the said promises in said declaration and each count thereof. As to the fifth, sixth and seventh pleas the plaintiff replied that the defendant did not pay the moneys in said pleas mentioned, as alleged in said pleas. The replication to the eighth plea denied that the plaintiff or his assignor were at any time indebted to the defendant. A demurrer to the replication to the second, third and fourth special pleas was overruled and the defendant rejoined, joining issue. The case was tried before a jury, evidence being submitted on behalf of the plaintiff and defendant. A motion was made by the defendant to take the case from the jury at the close of the plaintiff's evidence and again at the close of the whole evidence, but both motions were denied. The jury rendered a verdict for the above amount. Motions for a new trial and in arrest of judgment were denied and judgment was entered for the amount of the verdict as above. On appeal to the Appellate Court for the

First District the judgment was affirmed, and the record has been brought to this court by writ of *certiorari*.

It was assigned as error in the Appellate Court that the superior court erred in failing to enter judgment on the demurrer to the replications to the second, third and fourth pleas and in holding that the defendant was estopped from setting up the defenses by reason of its own wrong; the admission and exclusion of evidence; in failing to direct a verdict, for the reason that there was no basis whatever in the evidence for the verdict, and for the further reason that an accord and satisfaction had been pleaded and proven; error in the instructions and refusal of instructions tendered by the defendant. The errors assigned in this court are to the effect that the Appellate Court erred in affirming the judgment of the superior court; in holding that advertisements for bids for the contract sued on were not required under the law; in holding that the contract sued on was binding upon the parties; in holding that the appropriation of the proceeds of the vehicle tax, without specifying any amount, was a valid appropriation; in holding that there was no proof of accord and satisfaction; and in holding that the city could not challenge the validity of the contract because of the omission of preliminary formalities.

As to the first error assigned, the Appellate Court properly held that the defendant waived the questions presented by the demurrer by rejoining to the replication and in not standing by the demurrer. *Illinois Central Railroad Co.* v. *Parks,* 88 Ill. 373.

The facts material to a determination of the matters involved in the suit are as follows: On May 15, 1908, the commissioner of public works of the city of Chicago advertised for bids for furnishing all labor, material and apparatus and doing all the work necessary to make repairs to asphalt pavements during the term ending December 31, 1908, according to plans and specifications on file in the office of the department of public work, said bids to be re-

ceived by May 28 following. The advertisement stated that the commissioner of public works reserved the right to reject any or all bids. The specifications on file, and which were subsequently attached to the contract entered into between the assignor of the defendant in error and the city, among other things contained the following:

"Repairs to be made will consist of two classes, viz.: Class A, repairs requiring wearing surface, only; class B, repairs requiring wearing surface together with a Portland cement concrete foundation six (6) inches in depth, unless a different thickness is ordered as per specifications. The above two classes of repairs shall include the repair of all curb-stones and curb and gutters along the line of improvement; also the raising of any sewer, catch-basins or manhole covers to grade. * * *

"No bid will be accepted which does not contain an adequate or reasonable price for each and every item named in the schedule of quantities. * * *

*"Schedule of Quantities.*

27,000 square yards, more or less, repairing wearing surface, class A, . . . . . . per sq. yd.

13,000 square yards, more or less, repairing wearing surface, together with a six (6) inch Portland cement concrete foundation, class B, . . . . . . per sq. yd.

2200 cubic yards, more or less, Portland cement concrete in place.

120 tons, more or less, binder delivered on street ready for use.

570 tons, more or less, asphalt mixture delivered on street, ready for use. * * *

"Bidders must satisfy themselves, by a personal examination of the ground and locality where the proposed work is to be done, as to the accuracy of the foregoing estimated quantities, also as to the amount and character of the work to be done. Bidders must also make personal examination of all plans and must check the accuracy of all figures, and

said bidders agree to immediately call the attention of the commissioner of public works to any inaccuracies which may exist on said plans or in such figures. * * *

"Payment to be made from a fund of $50,000 appropriated by the common council of the city of Chicago February 21, 1908, for the repair of streets outside of contract reservations; also from a fund of $75,000, special appropriation for restoration of streets where excavations have been made by plumbers, sewer builders, etc. Payment may also be made from any revenue derived from a vehicle tax passed by the common council of the city of Chicago. * * *

"The work shall be carried on at such times and in such parts and in such manner as the commissioner of public works may direct. If for any cause the commissioner of public works finds it necessary or desirable to suspend operations for any considerable length of time, the contractor, on due notification, shall suspend operations until further notice is given him, and he will not be entitled to any damages, of any kind or nature whatsoever, because of such suspension. He will, however, be allowed further time in the completion of his contract equal to the delay caused by the suspension of the work, as further specified. * * *

"The commissioner of public works reserves the right to extend the time for the final completion of this contract for a further period of not to exceed ninety (90) days from and after said December 31, 1908."

In response to said advertisement six bids were received, including a bid from the assignor of the defendant in error, which bid was as follows: For class A repairs, $1.75 per square yard; for class B repairs, one cent per square yard; for cement concrete, $3.25 per cubic yard; binder, $4 a ton; asphalt mixture, $5 a ton. The lowest bidder was Thomas L. Dooley, whose bid was ninety-nine cents per square yard for class A repairs, $1.30 per square yard for class B repairs, $3.50 per cubic yard for cement concrete, $3.90 a ton for binder and $4 a ton for asphalt mixture. The other

bids ranged from $1.04 to $2.02 per square yard for class A repairs, $1.40 to $3 per square yard for class B repairs, $3.94 to $5.88 per cubic yard for cement concrete, $3 to $7.90 a ton for binder and $5.10 to $9.05 a ton for asphalt mixture. The lowest bidder, Dooley, submitted a written statement with his bid, to the effect that he would not have his asphalt repair plant ready to begin work for sixty days, and his bid was rejected, as the streets apparently were in bad condition and it was desired to begin the repairs as soon as possible. The McGovern Company was the next lowest bidder, in the aggregate. Said company had been engaged in that kind of work before for the city of Chicago and possessed a large equipment. The Western Construction and Maintenance Company, which had submitted a bid next higher than the McGovern Company, made a protest against the acceptance of the bid of the latter company but it was not heeded.

The superintendent of streets recommended that the bid of the McGovern Company be accepted, and after a conference with the commissioner of public works and the mayor and a consideration of the bids by those officials its bid was accepted and a contract entered into, which provided, among other things, that the McGovern Company was to furnish all labor, materials, tools and appliances and do all work and labor necessary for the repair of asphalt pavements in the city of Chicago, said work to be commenced on or before the second day of June, 1908, to progress regularly and uninterruptedly after it shall have been begun, excepting as otherwise ordered by the commissioner of public works, and finished and fully completed on or before the first day of July, 1909, the whole of the work to be commenced and carried on when and where the commissioner of public works shall direct. It was further agreed that all of said work was to be performed under the immediate direction and supervision of the commissioner of public works. The city of Chicago agreed, when the contract should be fully

carried out and completed and the work accepted by the commissioner of public works, to pay the amounts which the McGovern Company had bid for the different classes of work, and that, if the rate of progress were satisfactory to the commissioner of public works, estimates would be issued to the contractor during the making of said improvements for eighty-five per cent of the value of the work done and in place at the time of issuing such estimates, the remaining fifteen per cent being reserved until the final completion and acceptance of said work. Attached to the contract were the specifications, the material parts of which have been above set out.

The McGovern Company immediately went to work repairing the streets under the direction of the commissioner of public works and under the immediate supervision of M. J. Doherty, the superintendent of streets, and Paul Redieske, the assistant superintendent. In the employ of the city in the bureau of streets were a number of inspectors. The manner in which the work was done was as follows: The superintendent of streets would advise the McGovern Company what streets were to be repaired, and one of the street inspectors would go to the place where repairs were to be made and mark the area of the defective pavement with chalk. The surface of the pavement would then be removed, if necessary, sometimes by heating and sometimes by cutting, and the repairs made in class A or class B, whichever was deemed necessary and ordered by the officers of the city. In addition to this work a great many repairs were made of cuts in the pavement, caused by plumbers and public service corporations in making connections with water mains and gas pipes. In such cases those who made these cuts paid the city, and the city paid McGovern, for restoring the pavements. When repair work was completed and approved by the inspector it was measured by the inspector, assisted by an employee of the McGovern Company, the inspector in each instance holding the reading end

of the tape.    The inspector entered the area of the repair
work in what was known as a "field book."    The field books
used by the inspectors were afterwards turned in to the
bureau of streets.    On the trial of the case the defendant
produced these field books at the request of the plaintiff,
and thirty-one of them used in 1908, marked from "S-1"
to "S-31," inclusive, were offered in evidence, as were also
fourteen field books showing work done in 1909.    Each in-
spector who marked out the work to be done and afterwards
checked it up testified on behalf of the plaintiff to the en-
tries in the field books made by him and that they were
correctly made, and that such work was done on the public
streets or alleys of the city of Chicago at places where re-
pairs were necessary.    During the progress of the work the
McGovern Company from time to time presented bills to
the city, and these bills were checked up with the record of
the work as preserved in the field books, and if found to
correspond, an estimate was computed showing the amount
of work and quantity of material and the amount of money
due according to the contract price, and a warrant would be
drawn for eighty-five per cent of such estimate, the balance
of fifteen per cent being retained by the city in accordance
with the terms of the contract.    These bills and estimates
were also offered in evidence.    It was admitted that the
warrants received by the McGovern Company in accordance
with these estimates were all the payments made for work
done under this contract, and it affirmatively appears from
the evidence of the city officials that the work done was all
good work and was inspected and accepted as such.    Work
was continued under the contract by direction of the city
officers of the street department until the latter part of June,
1909, and bills were presented from time to time, and some
of them were paid and some of them were not paid.    When
work was finally stopped, 229,891.27 yards of class A work
and 12,064.03 yards of class B work had been paid for,
amounting to $413,248.03.    On August 4, 1909, the Mc-

281 — 18

Govern Company wrote a letter to the commissioner of pub-
lic works stating that the contract had expired on June 30
and that there was a large sum due the company for unpaid
bills and requesting payment of all moneys due before Au-
gust 7. Thereupon a final estimate was made and a war-
rant drawn for $61,987.21, being the fifteen per cent re-
serve withheld on previous estimates. After receiving this,
the McGovern Company made a demand for the further
sum of $117,394.22, and finally brought this suit to recover.

A summary of McGovern's claim for the work done, as
shown by the inspectors' books, and the amount his assignor
had received on this work, is as follows:

| | |
|---|---|
| Square yds. class A done in 1909................ | 78,513.36 |
| Square yds. class A done in 1909 (paid for)....... | 31,287.09 |
| Square yds. class A done in 1909 (not paid for)... | 47,226.27 |
| Square yds. class A done in 1908 (not paid for)... | 14,805.50 |
| Total unpaid class A yardage at $1.75 per sq. yd.. | $108,555.5975 |
| Tons of binder not paid for, at $4 per ton.......... | 6,159.20 |
| Total amount due and unpaid.................. | $114,714.79 |

This was the amount of the verdict and judgment.

The issues of fact raised by the pleadings and assign-
ments of error must be considered as settled by the verdict
of the jury and the judgments of the superior and Appel-
late Courts.

Taking up the questions of law involved, it is true that
section 50 of article 9 of the Cities and Villages act (Hurd's
Stat. 1916, p. 320,) provides that any work of any public
improvement, except such as is to be paid for in whole or in
part by a special assessment, shall, when the expense there-
of exceeds $500, be constructed by contract let to the low-
est responsible bidder in a manner prescribed by ordinance,
with certain stated exceptions, none of which exceptions ap-
ply to the contract under consideration. If the bid of the
McGovern Company for class B work was intended to cover
all the work and material required in making class B re-
pairs it was not in accordance with the specifications, which

provided that "no bid will be accepted which does not contain an adequate or reasonable price for each and every item named in the schedule of quantities." The language of the part of the specifications above quoted giving information to bidders is somewhat indefinite, as it may have been construed to apply only to material which was to be delivered in quantities. Conceding, however, that it applied to class B work, an analysis of the different bids submitted shows that only one of these bids,—that of the Barber Asphalt Paving Company,—was a strictly balanced bid, as we understand that term as used in the argument of counsel. Class A work apparently included the removal of portions of the surface and re-surfacing. Class B work apparently included the re-surfacing required in class A work and also a six-inch con-. crete base, if such base was included in class B work. There were also bids submitted for Portland cement concrete in place by the cubic yard and binder and asphalt mixture by the ton. A square yard of concrete six inches in thickness would be one-sixth of a cubic yard. The bid of the Barber Asphalt Paving Company was the highest bid on all items, and in the aggregate was $5.88 per cubic yard for cement concrete, $2.02 for class A work and $3 for class B work. A sixth of a cubic yard, according to the foregoing figures, would cost, at the same rate, ninety-eight cents, which would be exactly the difference between the bids for class A work and class B work. The other bids ran from thirty-one cents to sixty cents more for class B work than for class A work, and were not at all in proportion to the bids for cement concrete per cubic yard as made by the respective bidders.

It is claimed by counsel for defendant in error that under a reasonable interpretation of the advertisement for bids the bidder would be entitled to charge by the cubic yard and ton for the concrete binder and asphalt mixture put into class B work furnished in quantities, and it has not been pointed out where concrete and the other articles which were to be furnished in lots could be used except in class B

repairs. But however this may be, the specifications also provided that bidders should satisfy themselves, by a personal inspection, of the work to be done. The amount of either class A or class B work was uncertain, and for that matter the work which would be done under any contract which could be made was of such a nature that the quantity and kind of the different materials to be used were uncertain as well as in many other particulars.

The pavements to be repaired, as appears from the evidence, were in bad condition, being exposed to constant wear and constantly disintegrating. It was contemplated, and subsequently embraced in the contract, that the contractor should go wherever he was ordered by the superintendent of streets and do whatever work there was to be done at such places as he considered necessary. It appears from the evidence that the McGovern Company had worked for the city before on similar contracts and had had a large amount of experience in such matters, and it would be unreasonable to suppose that it did not make use of its knowledge of the pavements based on an inspection of the same, as provided in the specifications, and also on its previous knowledge and experience in such matters. The difference between class B repairs and class A repairs, as it actually turned out, was very small. Furthermore, even if the bid was subject to all the objections claimed by counsel for the city, the city exercised its right to reject other bids and accepted it. The McGovern Company may have thought when it made the bid that it was to get pay by the cubic yard for the concrete used in the class B repairs. In the contract entered into it was provided otherwise. The city agreed to pay "for repairing wearing surface, together with a six-inch Portland cement concrete foundation, class B, one cent per square yard." In the bills rendered by the McGovern Company all class B repairs were charged for at the price bid, (one cent a square yard,) and those that were paid by the city were paid on that basis.

In *Johnson* v. *Sanitary District*, 163 Ill. 285, the statute involved required that contracts which exceeded $500 should be let to the lowest responsible bidder. The lowest bid was $145,112 lower than the second bid. The sanitary district trustees rejected the lowest bid and awarded the contract to the next highest bidder, whereupon the lowest bidder instituted proceedings to compel the sanitary district to accept his bid. This court said on page 287 of the opinion: "The mandatory injunction applied for to compel the letting of the contract to appellant is in the nature of a *mandamus* and is an attempt to control a discretion that is judicial in its nature. The duty of examining the proposals, determining the responsibility and awarding the contract is judicial in its nature and character, and the awarding the contract is a judicial act, which is not within the province of the courts to control by *mandamus* or mandatory injunction. [Citing numerous authorities.] Nor can the courts, in the absence of fraud, restrain the trustees from entering into such contract as they may award to the bidder.—*Kelly* v. *City of Chicago*, 62 Ill. 279."

In *People* v. *Kent*, 160 Ill. 655, the relator had submitted a bid in conformity with specified conditions which was $3536 less than that of any other bidder, and he sought to compel Kent, who was the commissioner of public works of Chicago, to let the contract to him under the provisions of the same section heretofore referred to in this opinion. This court held that Kent was a proper officer to determine who was the lowest responsible bidder and award the contract, and on page 662 of the opinion said: "It appears that the defendant, after investigating the records made by the relator in doing similar work before, and the other matters referred to in his answer, determined that the relator was not the lowest responsible bidder. He was vested with the exercise of official judgment and discretion, with which, in the absence of fraud, courts have no right to interfere." To the same effect is *Hallett* v. *City of Elgin*, 254 Ill. 343.

It is also objected that there had been no ordinance appropriating a sufficient amount of money for the repairs in question. The appropriation ordinance, it is true, only appropriated $50,000 from the general fund for the work in question, but that was not all. The city council in the appropriation bill of 1908, adopted February 21, 1908, provided: "For restoration of streets where excavations have been made by plumbers, sewer builders, etc., $75,000; for repair of asphalt streets outside of contract reservations, $50,000; for repair of streets in addition to the sums above appropriated, all income from the vehicle tax collected under provisions of an ordinance passed February 2, 1908, after deducting therefrom the cost of collection; for removal and disposal of garbage, street and alley cleaning, repairing improved and unimproved streets, and sidewalk repairs," (then follows a specific sum for each ward, the sums thus appropriated totaling $2,107,540.) The commissioner of public works of the city of Chicago in a report to the mayor estimated that the vehicle tax above appropriated "provided a permanent revenue of from $500,000 to $600,000 for street repair purposes." In this connection it was shown that pursuant to an amendment to the Cities and Villages act approved December 31, 1907, and in force on the same date, the city was empowered to license all wagons and other vehicles conveying loads within the city, the license fee, when collected, to be kept as a separate fund and used only for paying the costs and expenses of street and alley improvements or repairs. Thereafter, on February 2; 1908, the city council passed a vehicle license ordinance fixing the license fees on vehicles in the city of Chicago, and provided, among other things, that all revenues derived from such license fees shall be kept as a separate fund and used for paying the costs and expenses of street and alley improvements or repairs, fifteen per cent of the total revenues to be expended, in the discretion of the commissioner of public works and under his direction, for the

repair of streets upon which there is an unusually heavy amount of traffic, the remaining eighty-five per cent obtained from each ward (as in the discretion of the commissioner of public works shall be needed for immediate use) to be expended, under the direction of said commissioner, for the repair of streets and alleys in such ward, the balance thereof to remain to the credit of such ward account, to be used as occasion required. It was clearly the intention of the city council, in the appropriation ordinance of February 21, 1908, to appropriate the license fees collected to the repair of streets, and this was what the statute provided should be done with such fees. It is not essential to the validity of an appropriation of money that it should be for an amount certainly ascertained prior to the appropriation. *People* v. *Miner,* 46 Ill. 384.

It is also urged that the contract is invalid because the time of execution extended beyond the fiscal year for which the appropriation was made, and in that respect was not according to the advertisement for bids. The contract provided that "said work shall be commenced on or before the second day of June, A. D. 1908, shall progress regularly and uninterruptedly after it shall have been begun, excepting as shall be otherwise ordered by the commissioner of public works, and be finished and fully completed on or before the first day of July, 1909, the time of commencement, rate of progress and time of completion being essential conditions of this contract." By other parts of the contract the manner of its execution, number of men to be employed and progress of the work were to be absolutely as directed by the commissioner of public works. That officer had the power, under the contract, to direct the number of men to be employed, to suspend the work on account of weather conditions and order its resumption, to make alterations in the work and determine the value of the work added or omitted. It is shown by the evidence that the work was at one time suspended by order of the commissioner of pub-

lic works. It is undoubtedly true that there are many objections to the contract which, had they been made at the proper time and in the proper manner, would be entitled to consideration, but that is not the question involved in this case. The sole question, so far as the right to recover on the contract is concerned, is whether, after making the contract and after the contractor has fully performed according to its terms and conditions and as directed by the city officials, and after the city has thereby received the benefit of the work, labor and materials, the city is now in the position to set up the informalities and irregularities urged, under the circumstances of this case.

There is a distinction between contracts which are *ultra vires* and contracts which are within the power of the city to make but which have been irregularly or illegally made but have been performed in good faith. In Dillon on Municipal Corporations (5th ed. sec. 1611) it is said: "A municipal corporation, as against persons who have acted in good faith and parted with value for its benefit, cannot, unless by virtue of some statutory provision, set up mere irregularities in the exercise of power conferred, as, for example, its failure to make publication in all of the required newspapers of a resolution involving the expenditure of moneys. Such failure might have the effect to invalidate a local assessment upon the abutter if there were no grounds of estoppel, this being a matter *in invitum,* but as regards a *bona fide* contractor with the city who had expended money for its benefit in respect of a matter within the scope of its general powers, the contract would not be *ultra vires* in the true sense of that term, and the city would be estopped to set up as a defense its own irregularities in the exercise of a power clearly granted to it." This principle applies to the case at bar. It was not shown that the McGovern Company did not enter into the contract in question and carry it out in good faith. Whether or not it did so was a question of fact and a matter of proof that has

been settled in its favor. The only argument against its good faith in making the contract was in making the so-called unbalanced bid in the manner it did. The reasons for making the bid in that manner have already been referred to. It might have been ground for rejecting the bid, but where the city accepted it and the company did the work under it and charged according to the bid, can the city now take advantage of that fact or of the other matters urged against the legality of the contract? From the whole record, the principal questions are whether the McGovern Company did the work for which McGovern, its assignee, is claiming pay and whether the amount claimed is owing for such work, and those questions have been answered in the affirmative by the verdict of the jury and the judgments of the superior and Appellate Courts, and we are unable to say from the evidence that they were wrong.

The contract sued on was of such a nature that the city could lawfully have entered into it. The city was charged with the duty of keeping its streets in repair for public use and was authorized by law to make the necessary expenditures and contracts for such purposes. It could and did appropriate, by ordinance, money from its general fund, and in addition thereto had been authorized by the legislature to impose license fees on vehicles using the streets and use the fees collected for such repairs, and by ordinance the city appropriated such fees for the purpose provided by law,—that is, the repairs for which the contract was entered into. The reason and purpose for such legislation are apparent, and the probable amount to be realized and expended from such fees appears in the record.

In *Village of London Mills* v. *White,* 208 Ill. 289, we held that where a village board has power, by ordinance, to grant to the owner of a telephone line the use of its streets and alleys, and where the consent to such use is given by resolution, merely, and where the licensee, with the knowledge and consent of the village authorities, has

accepted and acted upon such resolution by erecting poles and stringing wires in the streets and alleys, the license so granted thereby becomes a contract which is valid and bind- ing upon the parties thereto and cannot be revoked by the village, and that the village cannot be heard to say that the written consent must in the first instance have been given by ordinance, and it will be equitably estopped so to do.

In *County of Coles* v. *Goehring,* 209 Ill. 142, it is said on page 165 of the opinion: "Where a statute, in author- izing a municipal corporation to exercise a certain power, specifically regulates the mode in which that power is to be exercised, but the municipal authorities exercise it in a manner different from that prescribed by the statute, the municipality will be estopped from setting up the irregular exercise of the power when it is called upon to pay for what it has received, where the proof shows that it has re- ceived and accepted the benefit of the contract thus irregu- larly entered into." A large number of authorities are cited in the opinion in that case, among others, *County of Jack-* *son* v. *Hall,* 53 Ill. 440, in which it was held that the county of Jackson was estopped from denying liability, although there was no contract made, for the building of a jail, in- asmuch as the jail was accepted by the county authorities and used by them when completed; also *Hitchcock* v. *Gal-* *veston,* 96 U. S. 341, where the city agreed to pay for side- walks in bonds and the bonds were held to be invalid, and it was decided that the city was liable upon its contract, and that, although it had agreed to pay in a way in which it had no power to pay, having received the property it was estopped to deny its contract.

In *City of Chicago* v. *Pittsburg, Cincinnati, Chicago and* *St. Louis Railway Co.* 244 Ill. 220, we held that if a city may lawfully exercise a power, it may be equitably estopped, as right and justice may require, to question the validity of the exercise of such power on account of the manner in which it was done or because of the lack of required for-

malities,—citing *Chicago and Northwestern Railway Co.
v. People,* 91 Ill. 251; *City of Chicago* v. *Carpenter,* 201
id. 402; *People* v. *Blocki,* 203 id. 363; *Village of Win-
netka* v. *Chicago and Milwaukee Electric Railway Co.* 204
id. 297; *Village of London Mills* v. *White, supra.*

In *People* v. *Spring Lake Drainage and Levee District,*
253 Ill. 479, which involved the power of a drainage dis-
trict to make a stipulation, it is said on page 500 of the
opinion: "Contracts entered into by a municipality which
are prohibited by express provision of the law, or which
under no circumstances could be legally entered into, are
uniformly held to be *ultra vires* and void, and cannot be
rendered valid, as against the municipality, by receipt of
the consideration or other matter of estoppel, and cannot be
rendered valid and binding by any act of the municipality
ratifying the same. (1 Dillon on Mun. Corp.—5th ed.—
sec. 323.) There is another class of municipal contracts
which are usually classed as *ultra vires* which are only so
in a limited or secondary sense. These are contracts which
are within the general powers of the corporation but which
are void because the power was irregularly exercised, or
where some portion of an entire contract exceeds the cor-
porate powers but other portions of the contract are with-
in the corporate powers. This class of municipal contracts
is well illustrated by the case of *City of East St. Louis* v.
*East St. Louis Gas Light and Coke Co.* 98 Ill. 415.' In that
case the city of East St. Louis contracted for the lighting
of its streets with the gas company, at a fixed price per
light, for the term of thirty years. A suit was brought by
the gas company to recover the monthly installments that
were past due under the contract. The city defended on the
ground that the contract was *ultra vires* and that no suit
could be maintained thereon. This court held that the light-
ing of the streets was a purpose clearly within the corporate
powers of the city; that the contract had no element of
illegality in it and that it was only illegal in respect to the

term of its duration; that the corporation having received the benefits under a contract which was merely *ultra vires* it was bound to pay for the benefits received, and that the rule applicable to municipal corporations in this regard was the same as in the case of a private corporation. Many cases are to be found applying this rule, and the principle is now firmly established that the doctrine of *ultra vires* is not applied (except in cases where the contract is prohibited by some rule of law) where its enforcement would enable the municipality to obtain an unconscionable advantage of the other party to the contract, and that municipal corporations, as well as private corporations and natural persons, are bound by the principles of common honesty and fair dealing. Contracts made by a municipality which are merely *ultra vires* in a modified or secondary sense may be ratified and any defect in the manner of exercising the power thereby cured, and the municipality may likewise estop itself by acts *in pais* from setting up the defense of *ultra vires.*—2 Dillon on Mun. Corp.—5th ed.—sec. 797."

As to the defenses of accord and satisfaction and payment and set-off, these are for the most part questions of fact which have been settled contrary to the contention of plaintiff in error. The last warrant received by the McGovern Company, that of August 9, 1909, for the sum of $61,987.21, chargeable to the vehicle tax fund, was in payment of a bill for that amount marked "Estimate 47 and final," and as shown on its face was the reserve on asphalt repairs for said amount on the contract dated June 1, 1908, total amount of repairing, $413,248.03, amount paid on former estimates, $351,260.82, amount due contractor, $61,-987.21. This payment, as stated on the warrant, was for the fifteen per cent reserved from former estimates. It was not shown that the McGovern Company accepted it in full payment and satisfaction of all the unpaid bills which had been submitted to the city for work done under the contract but which had not been paid, or that it was ac-

cepted as anything more than it purported on its face to be,—the final payment of the reserve withheld from such bills as had been accepted and for which warrants had been previously issued for eighty-five per cent thereof. At the time of the trial Doherty, who had been superintendent of streets, and Redieske, the deputy superintendent, were both dead. Evidence offered, and the admission of which was refused, would not have been determinative of the issues and therefore would not have been material. The plaintiff in error did not show by any tangible or proper evidence that the McGovern Company ever waived its claim, nor any circumstances amounting to a waiver of the amounts claimed. There was a misunderstanding about the subject matter of the claim as shown by subsequent correspondence, which was not remarkable considering the vast amount of work done and the manner in which it was carried on in different localities,—sometimes on different streets or in different portions of the same street at the same time. Nor can it be said that the claim was not proven by proper evidence. The amount of work done was shown and the amount paid for was shown. If the defendant in error was entitled to recover at all he was entitled to recover for this difference, and that was the amount of the verdict and judgment.

Most of the refused and modified instructions which are complained of were drawn and offered on the theory of counsel for plaintiff in error as to the invalidity of the contract, and the subject matter of these instructions has been sufficiently considered. Other instructions on accord and satisfaction, payment, etc., which were refused, were not supported by the evidence and would have been misleading and improper if given.

Finding no error in the record sufficient to justify reversal, the judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*