ESTATE OF LEONARD E. BESINGER, Unimproved Properties Partnership by Greg Besinger, its Managing Partner, Plaintiff-Appellee, v. THE VILLAGE OF CARPENTERSVILLE, Defendant-Appellant.

Second District   No. 2—93—0310

Opinion filed March 3, 1994.

Bernard Z. Paul, of De Kalb, and Lee J. Schwartz, of Chicago, for appellant.

Ben Barnow and Albert Cueller, both of Barnow & Hefty, of Chicago (Alan M. Goldberg, of counsel), for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Plaintiff, the estate of Leonard Besinger, Unimproved Properties Partnership (Estate), brought this action seeking, among other things, a declaratory judgment that it owned the rights to connections, without charge, to the sewer and water system of the defendant, the Village of Carpentersville (Village). The Village appeals from an order of the circuit court of Kane County which denied its motion for summary judgment, but granted that of the plaintiff, as to count I of the complaint.

In 1961 Leonard W. Besinger, a real estate developer, owned 100% of the stock and was president of the Meadowdale Corporation (Meadowdale), an Illinois corporation engaged in the public utility business of providing sewer and water. Besinger entered into an agreement with Meadowdale whereby, if he constructed extensions to Meadowdale's existing sewer and water system in order to service any of his property which was annexed to Carpentersville, installed water meters in all buildings erected by him, and guaranteed his work for one year, he would have the right to make 3,000 connections, or tap-ons, to the Meadowdale sewer and water system without charge.

In 1962 Meadowdale agreed to sell its sewer and water system to the Village for $1,275,000. The agreement between Meadowdale and the Village included the following provisions:

"(d) [T]he purchase by the Village of the Water and Sewer System is subject to the terms and provisions of that certain Agreement by and between Meadowdale and Leonard W. Besinger dated September 21, 1961, *** whereby Meadowdale agrees to permit Leonard W. Besinger, his successors and assigns, to make

connections to the Water and Sewer System without charge provided that Leonard W. Besinger, his successors and assigns, furnishes and installs water meters for each said water connection. All extensions of the Water and Sewer System and connections shall be made by Leonard W. Besinger or his successors or assigns pursuant to such contract ***. Such construction shall be guaranteed for one (1) year.

(e) [The Village] shall adopt an ordinance stating that it will make no charges in the nature of tap-on fees, connection charges, or other charges or permit fees for the privilege of connecting to the Water and Sewer System, or any extensions thereof, where such connection is performed in a manner reasonably prescribed by the Village, and where such water and sewer mains are constructed by private parties and dedicated to the Village, and that any charges by the Village for connections performed by the Village shall approximate the cost of the materials and labor necessary to make said connection, but such ordinance, nor any other ordinance, shall in any way obligate Leonard W. Besinger, or his successors and assigns under the aforesaid contract in subparagraph (d) hereof to make any payment for tap-on fees, connection charges or any other charges for the privilege of connecting to the Water and Sewer System or any extension thereof as provided in the aforesaid contract."

The 1961 agreement between Besinger and Meadowdale was attached to the 1962 agreement.

After the Village purchased the sewer and water system, Besinger periodically applied for and received tap-ons without being charged any connection fees. Leonard Besinger died in 1982. In 1989 Greg Besinger, the son and personal representative of Leonard's estate, asked the Village to confirm the existence and number of unused, free water and sewer connections available under the 1962 agreement. The Village responded that it was not obligated to provide tap-ons to the heirs, successors, or assigns of Leonard.

The estate of Leonard Besinger filed a three-count complaint against the Village. Count I prayed for a declaratory judgment that the estate owned the rights to tap-ons without charge. Count II sought the enforcement of a settlement agreement concerning tap-ons for a particular parcel of real estate. In count III the estate requested an accounting. The present plaintiff was subsequently substituted for Leonard Besinger's estate.

During the litigation, the Village's motion to strike count III was granted. Ultimately, the trial court granted the Village's, but denied the plaintiff's, motion for summary judgment as to count II. Conversely, with regard to count I, the trial court granted plaintiff's

motion for summary judgment, while denying the Village's identical motion. The Village appeals only the part of the trial court's order relative to count I. Plaintiff has not cross-appealed.

Before we begin our examination of the issues in this case, we feel compelled to address the remarks made by the Village in the "Introduction" to its argument. With considerable consternation we point out that this section of the brief is not a fair introduction to argument at all. On the contrary, it amounts to nothing more than a personal diatribe against members of the Besinger family, both living and deceased. Repeatedly, it attacks these individuals on a personal level. It brims with totally unfounded, unsupported suggestion, innuendo, and, at times, virtual accusations of wrongdoing against the Besingers. No concession is made for the possibility that there may be legitimate differences of opinion on certain of the issues. At some points, the "Introduction" appears to be merely an attempt to place before this court irrelevant, but highly emotional facts or claims. Needless to say, defendant's introductory remarks bear little relevance to the case before us.

Our reaction to the opening portion of defendant's argument is simple and direct: there is no place for such an approach before this court. It is inappropriate, if not irresponsible, and serves only to create or exacerbate hostility and disrespect between the parties, as well as counsel, as witnessed by plaintiff's response in its own "Introduction." While plaintiff's response exhibits considerable restraint, it is regrettable that such a response had to be made at all. That the Village personally attacked its adversary is disturbing, both in and of itself, and in its negative effect on the system. All parties and their counsel, in all cases, do far better when they focus steadfastly on the issues rather than on each other.

We now return to the legal matters before us. The Village appeals the trial court's order granting the Estate's motion for summary judgment as to count I, the count which sought a declaration of the Estate's right to free tap-ons. A motion for summary judgment should be granted when the pleadings, depositions, and affidavits reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (735 ILCS 5/2—1005 (West 1992); *Wojdyla v. City of Park Ridge* (1992), 148 Ill. 2d 417, 420-21.) Since it is a drastic remedy, summary judgment should be granted only when the right of the moving party to relief is free from doubt. *Purtill v. Hess* (1986), 111 Ill. 2d 229, 240.

In response to count I of the complaint, the Village filed an answer and seven affirmative defenses. Maintaining that Meadowdale fully performed under the 1962 agreement and that the Village accepted

the benefits of that agreement, the Estate urges us to find that the Village is equitably estopped from asserting its affirmative defenses. The Village counters that it may not be estopped from challenging the tap-on provision in the 1962 agreement because that provision was void from the start for a number of different reasons.

The Village's first voidness argument proceeds as follows: (1) the tap-on rights claimed by the Estate arose solely from the 1961 agreement between Leonard Besinger and Meadowdale; (2) the 1961 agreement, which was incorporated into the 1962 agreement between the Village and Meadowdale, was void at the outset, and the tap-on provision of the later agreement, therefore, was also void; and (3) estoppel cannot be invoked to prevent a challenge to the validity of a contract. The Estate, in turn, insists we need not reach questions concerning the validity of the 1961 agreement since the tap-on rights at issue find independent roots in the 1962 agreement. Accordingly, the Estate prompts us to focus only on the later agreement.

The Village asserts that the 1961 agreement was void at the outset because it was contrary to the public policy of the State of Illinois. A party to a contract which is contrary to public policy is not estopped from raising its illegality as a defense. (*O'Hara v. Ahlgren, Blumenfeld & Kempster* (1989), 127 Ill. 2d 333, 349.) Thus, the Village is correct that equitable estoppel is not effective when a contract is challenged on the ground that it was void *ab initio*. However, even if the 1961 agreement was void, it would not matter here since such voidness would have no effect on the agreement reached between Meadowdale and the Village in 1962. After careful examination, we have concluded that the tap-on rights now claimed by the Estate were created by the 1962 agreement, independent of the earlier agreement between Meadowdale and Besinger.

■ The 1961 Besinger-Meadowdale agreement was clearly accommodated in the 1962 agreement. The nature of that accommodation is what we must determine. We acknowledge the references to the 1961 agreement in paragraphs 14(d) and 14(e) of the 1962 document. However, there is no question the 1962 contract was between Meadowdale and the Village rather than Besinger and the Village. Neither section 14(d) nor section 14(e) shows that the Village assumed the position of Meadowdale in the contractual relationship between Meadowdale and Besinger. Section 14(d) merely states that the purchase of the sewer and water system is "subject to the terms and provisions" of the earlier agreement. We do not read this language to be an assumption by the Village of Meadowdale's obligations under the 1961 contract, or to grant rights to Besinger only through the earlier agreement. Unlike the Village, we do not find that the

language even constitutes a clear incorporation by reference of the 1961 document. Rather, as we will discuss further below, we think section 14(d) sets forth an element of the Village's consideration for the purchase of the Meadowdale utility. It refers to the 1961 agreement merely to define the parameters of that consideration. Calling as it does for adoption of a municipal ordinance, section 14(e) is clearly unique to the Village and could not have been addressed between Meadowdale and Besinger. The reference in the section to Besinger's successors "under the aforesaid contract in subparagraph (d)" appears to be little more than the recognition of the "terms and provisions" to be included in the 1962 contract. In sum, we think these paragraphs reflect that the Village merely agreed *with Meadowdale*, not with Besinger, that it would extend to Besinger, through the 1962 contract, the same rights and obligations that Besinger had enjoyed under his earlier contract with Meadowdale. Hence, these were not the same rights and obligations that had existed directly between Meadowdale and Besinger.

We note, too, that contracts must be considered as a whole by viewing each part in light of the others. (*Board of Trade v. Dow Jones & Co.* (1983), 98 Ill. 2d 109, 122; *Robert S. Pinzur, Ltd. v. Hartford* (1987), 158 Ill. App. 3d 871, 876.) We have examined the 1962 agreement in its entirety and find that the Village bought the sewer and water property and operation *from* the Meadowdale Corporation. It did not buy the Meadowdale Corporation itself. The nature of the purchase is persuasive that the Village did not step into the shoes of Meadowdale with regard to Meadowdale's contract with Besinger. Moreover, there is no indication that Meadowdale ever assigned to the Village its contract rights and obligations under the 1961 agreement.

As we see it, for the 1962 agreement to be unenforceable on the basis of the 1961 agreement, Meadowdale's rights and obligations under its contract with Besinger would somehow have to actually shift to the Village so that the Village *could* legally stand in the shoes of Meadowdale. Absent an assignment or an assumption or some other method, this is not the case. In 1961 Besinger acquired rights directly through his contract with Meadowdale. In 1962 Besinger acquired a different and independent set of rights as a result of a contract between two other parties. Those rights flowed to him, not as a result of the assignment of his contract with Meadowdale, but from Meadowdale's contract with the Village. In effect, Besinger was a third-party beneficiary of that contract. In our opinion the 1962 references to the 1961 agreement were for the purpose of delineating a contract term between Meadowdale and the Village,

not for retaining Besinger's rights under his contract with Meadow-dale. Inasmuch as any rights the Estate may now have arose entirely under the 1962 agreement, the validity of the 1961 agreement is of no relevance. Consequently, we decline to resolve the various challenges made by the Village to the 1961 agreement.

While not deciding the issue, we wish to point out that the Village claims the 1961 agreement was void primarily for failure to comply with section 8a(3) of the Public Utilities Act (Act) (Ill. Rev. Stat. 1961, ch. 111²/₃, par. 8a(3) (now codified, as amended, at 220 ILCS 5/7—101(3) (West 1992))). Section 8a(3) required that contracts made by a utility with an "affiliated interest" (Besinger fell within the definition of an "affiliated interest") had to be filed and consented to by the Illinois Commerce Commission. The statute then expressly stated that such contracts or arrangements not consented to or accepted by the Commission were void. The Estate does not contest that the 1961 agreement was not filed or approved by the Commission.

Section 8a(3) was discussed in *People v. Phelps* (1978), 67 Ill. App. 3d 976, where the defendant was convicted of violating, among others, section 8a(3) of the Act. The defendant had failed to file with and secure the consent of the Commission to a loan agreement which resulted in the transfer of funds from a utility to an affiliated interest. The affiliated interest, a nonoperating holding company, invested the funds for its own benefit. In affirming the conviction the court explained that regulation of public utilities is for the common good and quoted the following from *United Air Lines, Inc. v. Illinois Commerce Comm'n* (1965), 32 Ill. 2d 516, 522:

> " '*** Service to the public is the very reason for the existence of a public utility. The legislature, as the representative of the public, must necessarily concern itself with the continued financial responsibility and ability of the utility to render its service, and must likewise insure that those who operate it do not "lead it into paths of ruin." ' " (*Phelps*, 67 Ill. App. 3d at 979.)

The court further explained that, in order to insure the continued financial responsibility of public utilities, the legislature had granted the Commission the power of oversight of transactions between utilities and affiliated interests. Although the issue in *Phelps* was not whether a transaction was void, it is clear from the court's discussion that section 8a(3) was devised to insulate public utilities from financial exploitation, for the benefit of those served by the utilities. Thus, the provision was meant to protect those who might be affected by improper transactions. It was not intended to aid a third party, like the Village, who wished to find an agreement void, not to protect the public or because the parties failed to comply with the Act, but

only so it could disavow a subsequent agreement of its own. In this regard, it is highly likely, as claimed by the Estate, that the Village lacks standing to assert a violation of the Public Utilities Act.

■ It is next asserted that the tap-on provision is void because the Village lacked the power in 1962 to charge or waive fees for connection to its sewer and water system. A contract entered into by a municipality without authority is *ultra vires* and void, and, in the event it lacked the initial power to enter into the contract, the municipality may not be estopped from challenging the validity of the contract, even though the other contracting party may have performed. (*Elk Grove Township Rural Fire Protection District v. Village of Mount Prospect* (1992), 228 Ill. App. 3d 228, 234, citing *McGovern v. City of Chicago* (1917), 281 Ill. 264.) Accordingly, we will examine the Village's argument.

After correctly pointing out that it is not a home rule unit of government and, therefore, may exercise only those powers delegated to it by the legislature (see *Pesticide Public Policy Foundation v. Village of Wauconda* (1987), 117 Ill. 2d 107, 111-12), the Village avers that it was not until 1967 that the legislature enacted a statute which expressly authorized municipalities to collect a charge for connection to a municipal water and sewer system. Absent statutory authorization to charge tap-on fees in 1962, the Village reasons, it had no power to waive them, either. There is no merit to this argument.

Section 11—139—1 *et seq.* of the Municipal Code (Ill. Rev. Stat. 1961, ch. 24, par. 11—139—1 *et seq.* (now codified, as amended, at 65 ILCS 5/11—139—1 *et seq.* (West 1992))) governed the financing of combined sewer and water systems in 1962. Section 11—139—2 of the statute provided:

> "A municipality owning, acquiring, or constructing and providing for the operation of a combined waterworks and sewerage system may improve and extend that system, and *may impose and collect charges or rates for the use of that system ***.*" (Emphasis added.) (Ill. Rev. Stat. 1961, ch. 24, par. 11—139—2 (now codified, as amended, at 65 ILCS 5/11—139—2 (West 1992)).)

Again, in section 11—139—8, the statute stated that a municipality which had its own water and sewer system could charge its inhabitants "a reasonable compensation for the use and service" of the system and could establish rates for that purpose. (Ill. Rev. Stat. 1961, ch. 24, par. 11—139—8 (now codified, as amended, at 65 ILCS 5/11—139—8 (West 1992)).) The rates, in turn, had to be sufficient to pay the cost of operating and maintaining the system, provide a depreciation fund, and pay off any revenue bonds issued to pay for acquiring, constructing, extending or improving the system. The

municipality could also charge differential rates so that the area to be served by an extension or improvement would produce enough revenue to pay for that particular improvement over and above the revenue provided by the rate normally applicable to the area.

While the Village devotes very little attention to the statutory provision cited above, its position appears to be that the language does not expressly include connection fees and, therefore, does not allow such fees. However, provisions very similar to the ones we have cited were challenged in *Spalding v. City of Granite City* (1953), 415 Ill. 274. The provisions at issue in *Spalding* related to systems consisting of sewers only, as opposed to the combined sewer and water system involved in this case. (See Ill. Rev. Stat. 1951, ch. 24, pars. 60—12 through 60—18 (now codified, as amended, at 65 ILCS 5/11—141—12 through 11—141—18 (West 1992)).) Nevertheless, the statute there also contemplated that the municipality could recover the cost of an extension to the system from the users of that extension, as opposed to the users of the entire system. In resolving an equal protection challenge to the statute, the *Spalding* court found, essentially, that those benefitting could properly be held responsible for the cost of the benefit. The court noted that only the property owners in the area to be served would have access to the new sewer and that other citizens of the municipality had paid for previously constructed sewers with their taxes, unaided by the newcomers. Too, the newcomers would now benefit from the use of the existing sewers, even though they did not pay for them, since the sewage from the area would be carried into and through the old system. In sum, the court decided that a charge imposed to finance the extension of a sewer system was appropriate when tied to the use of the system. We note that the resolution adopted by Granite City, which prompted the challenge to the enabling statute, not only set forth possible rates to be charged to users of the sewer extension and reserved the right to establish differential rates, it also stated a "connection charge."

Subsequently, in *Norwick v. Village of Winfield* (1967), 81 Ill. App. 2d 197, this court examined a municipal ordinance adopted pursuant to the same provisions of the Municipal Code as are involved here. While *Norwick* was controlled by the 1965 statute, rather than the 1961 statute which governs this case, the relevant language of sections 11—139—2 and 11—139—8 is identical in the two statutes. (See Ill. Rev. Stat. 1961, ch. 24, pars. 11—139—2, 11—139—8; Ill. Rev. Stat. 1965, ch. 24, pars. 11—139—2, 11—139—8 (now codified, as amended, at 65 ILCS 5/11—139—2, 11—139—8 (West 1992)).) In *Norwick*, the Village of Winfield charged a fee of $125 for making connection to its sewer mains. Under the challenged ordinance,

however, it charged an additional fee, consisting of a "sewer property charge" and a "treatment plant charge." (*Norwick*, 81 Ill. App. 2d at 198.) The village conceded that the additional fees had no relation to the cost of connecting the sewer system but were held and used for the purpose of constructing future improvements and extensions to the system.

After setting forth sections 11—139—2 and 11—139—8, we concluded as follows:

> "It appears from the legislative scheme that municipalities may extend their sewer systems and may provide for and collect charges for the use of those systems. *** It is apparent that the legislature envisioned a pay-as-you-go scheme whereby an individual property owner would pay for his actual use of the system. Charges for the actual use of a system have been sustained and a municipality is not limited to financing local improvements by special assessment or special taxation. *Spalding v. City of Granite City*, 415 Ill. 274, 113 N.E.2d 567 (1953)." (*Norwick*, 81 Ill. App. 2d at 200-01.)

In further discussing the concept developed in *Spalding*, that charges could be made for the use of a sewer system, we added:

> "The name given the charge is of no consequence, the key being whether or not the charge is for actual use or for some undetermined use." (*Norwick*, 81 Ill. App. 2d at 201.)

After determining that, through its additional fees the village was trying to create a fund to build sewers at some undetermined place and future time, we stated:

> "We therefore hold that connection charges may be established and collected for the actual use of an existing sewer or sewer system." (*Norwick*, 81 Ill. App. 2d at 203.)

Charges not relating to actual use, such as those imposed by the city, were not authorized by the statute and were therefore invalid.

While *Norwick* was decided in 1967, after the 1962 agreement involved here, *Spalding* was decided in 1953. Although *Spalding* examined what was technically a statute different from the one in this case, the principles underlying both statutes are the same, and those principles are expressed in similar language. Accordingly, like the *Norwick* court, we rely on *Spalding*. As did our predecessors under the 1965 statute, and for the same reasons, we find that the 1961 statutory provision for the charges for use and service of the sewer and water system provided the authority for the imposition of a fee for connecting to that system.

The Village's reliance on section 11—150—1 of the Municipal Code (Ill. Rev. Stat. 1969, ch. 24, par. 11—150—1 (now codified, as

amended, at 65 ILCS 5/11—150—1 (West 1992))) is misplaced. The section states:

> "The corporate authorities of any municipality operating a \*\*\* combined waterworks and sewerage system have the power by ordinance to collect a fair and reasonable charge for connection to any such system in addition to those charges covered by normal taxes, for the construction, expansion and extension of the works of the system, the charge to be assessed against new or additional users of the system and to be known as a connection charge. The funds thus collected shall be used by the municipality for its general corporate purposes with primary application thereof being made by the necessary expansion of the works of the system to meet the requirements of the new users thereof." (Ill. Rev. Stat. 1969, ch. 24, par. 11—150—1 (now codified, as amended, at 65 ILCS 5/11—150—1 (West 1992)).)

The Village correctly points out that this provision was enacted in 1967 (1967 Ill. Laws 2805 (§ 1)). However, it did not grant to a municipality for the first time the power to impose connection fees, as claimed by the Village. Rather, we believe the statute could be viewed as codifying the portion of *Norwick* which determined that a connection fee could be collected for the use of a system. The new statute did, however, depart dramatically from precedent, in that it allowed such fees to be used by the municipality, primarily for expansion of the utility system, but also for the municipality's general corporate purposes. Both *Spalding* and *Norwick* had indicated that fees were to be based on a connecting party's actual use of the system and could not be earmarked for some indeterminate or unrelated purpose. In any event, municipalities had the power to impose connection fees in 1962. In its brief, the Village acknowledges that a municipality may by contract limit its powers. (See *La Salle National Bank v. City of Warrenville* (1982), 105 Ill. App. 3d 643, 647.) Thus, the Village had the power both to charge and to waive the relevant fees.

The Village is not helped, either, by its arguments that in 1962 it was not exercising its *Norwick* powers to charge connection fees, or that it did not dedicate fees received to the payment of revenue bonds. The issue, raised by the Village, is whether it had the *power* to impose and waive tap-on fees. We conclude that it did. Contrary to the Village's implication, *Norwick* did not establish that the issuance of revenue bonds was a necessary prerequisite to the exercise of the power.

■ Finally, the Village's assertion that the statutory scheme precluded it from contracting for tap-ons without charge is baseless and without merit. The statute provided that a municipality "may"

use money or "may" use revenue bonds to "defray" the cost of acquiring a sewer and water system. (Ill. Rev. Stat. 1961, ch. 24, par. 11—139—3 (now codified, as amended, at 65 ILCS 5/11—139—3 (West 1992)).) It neither limits a municipality to these two alternatives nor precludes the use of free tap-ons as consideration. Too, municipalities are not *required* to establish rates, as the Village insinuates. Rather, under the statute the rates "shall" be established by ordinance, *assuming* the municipality has decided to charge its inhabitants for the use of the system, something which they "may" do. (Ill. Rev. Stat. 1961, ch. 24, par. 11—139—8 (now codified, as amended, at 65 ILCS 5/11—139—8 (West 1992)).) It appears to us that if the Village's argument were to prevail, a municipality could never waive a connection fee. We are prompted to wonder what the Village's position would be should it be favorable to the Village in a future contract to waive such a fee.

■ In another attack on its validity, the Village contends that the 1962 agreement for free tap-ons violated article IV, section 20, of the Illinois Constitution of 1870, which stated:

"The State shall never pay, assume or become responsible for the debts or liabilities of, or in any manner give, loan or extend its credit to, or in aid of any public or other corporation, association or individual." (Ill. Const. 1870, art. IV, § 20.)

The Village proposes that the tap-on provision amounted to an impermissible extension of its credit to Besinger. The Estate responds that the provision is part of the consideration owed by the Village for its purchase of the sewer and water system from Meadowdale. As we noted earlier, we have reached the conclusion that the Estate is correct on this point. Inasmuch as the free tap-ons constituted consideration, we do not believe the agreement violated the constitutional prohibition on extension of the municipality's credit. To hold otherwise would mean that a local governmental unit could not lend its credit for the transaction of business properly authorized by the State legislature. There is no dispute that the municipality was empowered by statute to acquire the Meadowdale system.

The Village paid Meadowdale $1,275,000 cash, derived from the sale of revenue bonds, as part of the consideration for the purchase. It is reasonable to assume the cash payment to Meadowdale would have been considerably higher if the Village had not agreed to free tap-ons as part of the total consideration since Meadowdale was obligated to provide such tap-ons pursuant to its contract with Besinger. Consequently, the Village agreed to the tap-ons for its own benefit. Any benefit to Besinger was merely a necessary incident of the contract. The constitutional provision cannot be interpreted to

prevent a municipality from securing the very best terms for itself in a permitted business transaction.

The Village's reliance on *Schuler v. Board of Education of Oak Park & River Forest Township High School District No. 200* (1938), 370 Ill. 107, is not persuasive. In *Schuler* the Illinois Supreme Court found a contract by a public high school district to permit the use of its library and certain equipment by a private junior college to constitute a loan of public credit and property, contrary to the provisions of section 20 of article IV of the 1870 constitution. According to the court, the high school board lacked the power to make a contract with a private corporation "for joint use of its library and equipment." In contrast, this case in no way involves joint public-private use of public property. Rather, it involves a contractual *quid pro quo, i.e.*, the giving of free tap-ons in lieu of additional money in partial exchange for the purchase of a utility, by a governmental unit with power from the legislature to enter into such a purchase. *Schuler* does not alter our determination that the tap-on agreement did not violate the 1870 constitution.

■ In a final attempt to block the Estate's invocation of equitable estoppel, the Village submits that the 1962 agreement was void because, although it obligated the municipality to expend funds, it was not supported by an appropriation ordinance. We agree with the Village that in 1962 the Municipal Code provided that no contract involving municipal expenditures could be made by the corporate authorities unless an appropriation had previously been made concerning that contract, and contracts made in violation of the statute would be void. (Ill. Rev. Stat. 1961, ch. 24, par. 8—1—7 (now codified, as amended at 65 ILCS 5/8—1—7 (West 1992)).) However, we fail to see how this requirement applies here. To begin with, there is no dispute that the necessary ordinance was passed, and voter approval was secured, regarding the issuance of revenue bonds for the overall purchase of the sewer and water system. With regard to just the tap-on provision, under the 1962 agreement the Village merely waived the tap-on fees. Nowhere in the document is there any commitment by the Village to spend any money. The Village urges that it would have to spend money in order to expand its system to accommodate the tap-on obligation. At the same time the Village recognizes that it was Besinger, not the Village, who was required under the agreement to extend the utility lines to the property to be served and to furnish and install the water meters. On this record we can find no expenditures required of the Village by the agreement. Absent any amounts coming due under the contract, there was no need for an appropriation ordinance. The Village's argument has no substance.

■ Since the tap-on provision of the 1962 agreement was not void, we will now consider the Estate's estoppel argument. The doctrine of equitable estoppel is invoked to prevent injustice, and the test is whether, under all the circumstances, conscience and honest dealing require that a party be estopped. (*Byron Community Unit School District No. 226 v. Dunham-Bush, Inc.* (1991), 215 Ill. App. 3d 343, 348.) Estoppel arises when a party, by his words or conduct, reasonably induces another to rely on his representations and, as a result of that reliance, the other changes his position to his injury. *Byron*, 215 Ill. App. 3d at 348.

■ We agree with the Estate's contention that the Village represented in paragraphs 14(d) and 14(e) of the 1962 agreement that it would provide to Besinger, at no charge, 3,000 tap-ons to the sewer and water system, as part of the consideration for the purchase of the system. We find the language of the promise to provide tap-ons clear and unambiguous. The Village's argument that the promise did not constitute consideration is not effective. The "therefore" clause of the agreement, following the various recitals, states: "[F]or and *in consideration of* the mutual covenants hereinafter contained the parties agree as follows." (Emphasis added.) The paragraphs containing the tap-on agreement appear in section 14, which is titled "Agreements by the Village." We think it is apparent from this language that the promises made by the Village in section 14 were, indeed, additional consideration for the purchase. Moreover, as the Estate points out, the tap-on provision provided a clear benefit to third-party beneficiary Besinger and a detriment to the Village. Any act or promise which is of benefit to one party or disadvantageous to the other constitutes consideration to support a contract. (*Harris v. Johnson* (1991), 218 Ill. App. 3d 588, 593.) The benefit-detriment aspect of the tap-on provision is persuasive that it was intended to serve as consideration.

The Village suggests that the references in paragraphs 14(d) and 14(e) to the 1961 agreement reflect merely an intention that the Village would manage the utility in a manner favorable to the continued development of the Village. This suggestion is not only thoroughly speculative, but whatever substance it might otherwise have is undercut by the benefit and detriment which would occur from execution of the agreement. Also, if the references were intended to serve only the purpose suggested by the Village, we fail to see how they could possibly be sufficient to support the Village's position that, by being included in it, they rendered the 1962 agreement void.

As for the element of reliance, the Village claims the Estate

should not have relied on the tap-on covenant in the 1962 agreement because it was illegal or beyond the power of the Village. Inasmuch as we have already determined the covenant was neither illegal nor *ultra vires*, the Village's argument must fail.

The Village further charges that the Estate cannot show any injury arising from its reliance on the 1962 agreement. As we understand it, the Village's argument is that the Estate has not performed its commitment to extend the existing system and install water meters, as set forth in the tap-on provision, and, therefore, it is not entitled to the free connections. The Village submits that furnishing and installing of water meters is a condition precedent to receiving free tap-ons. Once again, the Village's argument has no substance.

First of all, the tap-on covenant was part of the consideration given by the Village for the purchase of the utility system, and the sale of the system to the Village was accomplished long ago. It is apparent the Village has received the benefit of its bargain with Meadowdale. The Estate does not contest that, in order to secure a tap-on, it must extend a line to the location of the connection and furnish and install a water meter for that connection. However, the Village has told the Estate that it will not grant it any more free tap-ons. It is unreasonable to expect the Estate to make the extensions and provide the meters for tap-on locations, as required by the 1962 agreement, when the tap-ons themselves will not be permitted, even though they, too, are required under the agreement.

We believe the Estate correctly characterizes its obligations as, at the very least, concurrent with the obligation of the Village to provide the no-charge connections. Even if the Estate's obligation were a condition precedent, such a condition would have little meaning here where the Village has already stated it will not grant the tap-ons at no charge. We conclude that the Estate need not have completed its obligations relative to the tap-ons in order to show prejudice for purposes of equitable estoppel. The Village received the benefit of its bargain. The Estate has not received the corresponding benefit it was supposed to receive as a result of that same bargain. To allow the Village now to renounce its contractual obligations would work an injustice to the Estate. Consequently, we find that the Village is estopped from asserting any of its remaining affirmative defenses. See *Byron Community Unit School District*, 215 Ill. App. 3d at 348.

In sum, absent any remaining issue as to any material fact, we find that the Estate was entitled to judgment as a matter of law, and the trial court, therefore, properly granted its motion for summary judgment. *Wojdyla*, 148 Ill. 2d at 420-21.

For the reasons set forth above, the order of the circuit court of Kane County granting the motion of the Estate for summary judgment is affirmed.

Affirmed.

INGLIS, P.J., and GEIGER, J., concur.