(No. 21630.—

THE GREAT LAKES DREDGE AND DOCK COMPANY, Plaintiff in Error, *vs.* CITY OF CHICAGO, Defendant in Error.

*Opinion filed June 22, 1933—Rehearing denied October 12, 1933. Leave to file second petition denied December 7.*

DEYOUNG and SHAW, JJ., dissenting.

COOKE, SULLIVAN & RICKS, (GEORGE A. COOKE, OLIVER R. BARRETT, and EDWARD H. FIEDLER, of counsel,) for plaintiff in error.

WILLIAM H. SEXTON, Corporation Counsel, (MARTIN H. FOSS, and CARL J. APPELL, of counsel,) for defendant in error.

Mr. JUSTICE STONE delivered the opinion of the court:

This cause is here on writ of *certiorari* to the Appellate Court for the First District to review the judgment of that court affirming a judgment of the circuit court of Cook county in favor of the defendant in error and against plaintiff in error for costs. The Appellate Court has certified that there is fairly involved in the claim of plaintiff in error more than $1500. The action is one in assumpsit against defendant in error to recover the sum of $150,000 on account of materials and labor furnished under the direction of the commissioner of public works of defendant in error city, which were found necessary to the completion of a contract for the straightening of the south branch of the Chicago river. A jury was waived and a trial was had before the court.

The facts as shown by the record are undisputed, and the questions presented concern the construction of the contract between the parties and the power of the commissioner of public works to bind the city.

On July 28, 1926, the city of Chicago adopted an ordinance for straightening the south branch of the Chicago river. This ordinance provided for altering that stream between Polk street on the north and West Eighteenth street on the south by excavating a new channel 200 feet in width and about 26 feet in depth for a distance of about 5000 feet, the construction of dock walls along the banks and filling in the old channel of the river with earth. This ordinance also provided for making certain property adjustments with the railroads and other property owners then occupying the land in which the new channel was to be cut. It fixed the amount to be paid to the railroads, the method of payment and the proportion of the total cost of the improvement to be borne by the railroads and the city. The ordinance authorized the commissioner of public works to make any and all contracts necessary for carrying out the improvement, work of cutting the new channel and

constructing the dock walls, and provided that all work was to be done under his supervision and control.

Pursuant to this ordinance the commissioner of public works issued to bidders a form of contract and complete specifications for the work and the manner of its completion. On August 8, 1928, pursuant to the ordinance, the commissioner of public works entered into a contract with plaintiff in error for cutting the channel and constructing the dock walls. The contract provided for payment to plaintiff in error at specified unit prices for all work done by it under the contract. The unit prices were contained in the fourteen clauses of the contract, lettered "A" to "N," inclusive. The quantity of work was estimated, but the total cost of the work was made to depend upon the quantity actually required of the items of material and labor at the unit price for each item. The cost of the work to be done under this contract with plaintiff in error was estimated at approximately $2,700,000. The contract required that the work be done in accordance with plans prepared for doing the same on file in the office of the department of public works and the specifications appended thereto; that the work be commenced when the contractor was notified by the commissioner, and that it progress regularly and uninterruptedly except as should be otherwise ordered by the commissioner of public works. The work was to be completed within ten working months from the date of notification to the contractor to proceed with the work. Working months were specified as being between April 15 and November 15 of any year. The contract also provided that when the weather conditions were such that work could not be done, proper directions were to be issued by the commissioner and action taken by the contractor to cover and protect the work so that it would not be injured by the weather. The contract especially reserved to the commissioner of public works the right finally to decide all questions arising as to the proper performance of the con-

tract or to forfeit the same for failure to comply therewith and re-let without further advertising, and to adjust differences or damage, if any, in case of such re-letting.

In addition to the items as to materials and labor and the unit prices thereof enumerated in clauses "A" to "N," the contract contains a clause designated as clause "O," which is as follows: "If during the construction of the work covered by these specifications unexpected contingencies should arise that would require additional plant, material and labor other than is required in any of the above items, the undersigned further agrees to supply the additional plant and furnish the additional material and labor complete for the following unit prices:" There follow eleven specified items, with the unit price for each.

The contract also provided: "The right is reserved to the city of Chicago, through its commissioner of public works, to make alterations in the plans and specifications for the work included herein. Should it become proper or necessary, however, in the execution of the work, to make any alterations which will increase the expense, said commissioner of public works shall report to the city council the nature of such alterations and his estimate of the amount by which the expense to the city shall be thereby increased. The amount by which the contract price shall be increased in consequence of such alteration shall be determined by the city council. It is expressly understood and agreed that no payments shall be made to the party of the first part [contractor] for any work or material or of any greater amount of money than is herein stipulated to be paid, unless such changes in or conditions to the contract requiring additional outlay by said party of the first part shall first have been especially authorized by the city council of the city of Chicago and ordered in writing by the commissioner of public works."

Item 16 of the specifications, which were made a part of the contract, is as follows: "It is to be understood that

there will be no additional payments allowed for any delay in the work. When the delay is caused by the city of Chicago for any reason whatsoever or delay results from other causes over which the contractor has no control, the contractor will be granted an extension of time equal to such delay, and this is to be the only compensation that the bidder shall be entitled to or receive for such delay."

The plan was to begin by cutting the new channel at a point in the river between Polk street and Taylor street and proceed south with the excavation to Eighteenth street, where the new channel was to again connect with the river. The work was to be done by permitting the water from the river to follow into the excavated channel and materials excavated placed on barges and transported north by way of the river. As excavation of the new channel proceeded the dock walls were to be constructed along each bank of the new channel. Under the specifications the dock walls were to be of a substantial character, consisting of round piling driven to bedrock and sheet piling driven back of the round and all capped by a cap of concrete seven feet in thickness and seven and one-half feet in width, the piling to be anchored and back-filled with earth and stone. The specifications required the concrete cap to extend about two feet below what is characterized in the contract as the "flow line." This line was fixed by reference to certain points below city datum and this record shows that it was to represent the normal surface of the river. The purpose of so fixing the flow line was to insure in normal flow of the river that approximately two and one-half to three feet of the concrete cap to the dock wall would be below the surface of the water and thus prevent deterioration.

Plaintiff in error proceeded promptly with the work and by May 28, 1929, had excavated the greater portion of the new channel and had driven substantially all of the piling for the dock wall. In the autumn and winter of 1928-29, Lake Michigan, which controls the level of the water in

the Chicago river, instead of undergoing what this record shows was its normal recession of water level, actually increased in height, so that with the normal increase in the spring of 1929 the water had risen three and one-half to four feet above the flow line as designated in the plans for this improvement. The record shows that this rise was due in a large part to the action of the United States government opening the sluice gates between Lake Superior and Lake Michigan, thereby greatly increasing the flow of water from the former into the latter. Due to the unprecedented rise in the level of the river it became impossible for plaintiff in error to continue the work of placing anchor rods through the piling and bolting the timbers and sheet piling into position for the dock wall, as such work, which under normal conditions was to be done two and one-half to three feet below the surface of the water, was then met with from six and one-half to seven feet of water, rendering it impossible to do this work or to pour the concrete cap on the dock walls, as it would then have been necessary to pour such cap in about six feet of water. The contract provided severe penalties for failure to complete the work within the ten working months and time was made an essence of the contract. It appears that by reason of the undertaking of the city to pay large sums, amounting to $7,000,000, to the railroads and other property owners for moving tracks and buildings, and the payment of interest on its obligations arising out of the improvement, very large pecuniary losses would result to the city from any delay in the completion of the work under the contract here under consideration.

In the spring of 1929 plaintiff in error, in its endeavor to do the work by use of divers and other means, by which it hoped to cope with the high-water conditions, had expended something over $20,000 by May 28, 1929. This, however, proved unsuccessful. On that date plaintiff in error called to the attention of the commissioner of public

works the high water, which was then about four feet above the flow line, asserted the impossibility of continuing the work, and, in accordance with its right under the contract, requested such extension of time as would elapse while waiting for the waters to recede. Plaintiff in error pointed out that this demand was made under the terms of the contract allowing delays when unprecedented conditions arose which were beyond the control of the contractor. On June 7, 1929, the city's engineer of bridges sent a report to the engineer in charge of the river-straightening work, reciting in detail the facts with respect to the high water and the impossibility of continuing the dock work in the manner provided in the plans and specifications. This report stated that the water level might not return to normal stage for a period of two or three years, and that if the completion of the project was delayed the city would incur tremendous financial losses by being unable to deliver to the railroads the lands to which they were entitled, and set out, specifically, losses to the city totaling over $400,000 per year. Plaintiff in error's demand was refused, but, in turn, it was requested to submit for consideration a detailed proposal for reducing the level of the water by means of cofferdams. On June 25 plaintiff in error replied, repeating its demand for an extension of time under its contract provisions, and submitting, as requested, plans for and costs of cofferdams and for reducing the level of water and diverting sewage so as to permit continuation of the work. On request another letter submitting fuller details was sent to the commissioner of public works on July 2, 1929. This letter called attention to the fact that the work was ahead of the schedule provided in the contract, but that due to the high-water conditions it was impossible to continue the work in the manner required by the contract. On July 9 the commissioner and other officials of the city visited the site of the work, and on July 18 a conference was held at which the commissioner requested plaintiff in error to do

the additional work of the cofferdams without expense to the city, which plaintiff in error refused to do. At this meeting the commissioner announced that he was of the opinion that the work was not included in the prices fixed in clauses "A" to "N" for construction of dock walls and that the plaintiff in error was not required to do this work at its own expense. The commissioner then directed plaintiff in error to do the work at the expense of the city at the unit prices fixed in clause "O" of the contract. Under this clause the estimate of cost of constructing cofferdams and flumes would be approximately $200,000, but at the request of the commissioner plaintiff in error agreed to construct the necessary cofferdams and flumes at the unit prices fixed in clause "O" of the contract, with a maximum cost to the city of $150,000, on condition that the commissioner would give plaintiff in error the order to proceed immediately. The commissioner directed plaintiff in error to proceed immediately with the work and promised to send him a written order to that effect. He also instructed the city engineer to prepare such an order. The commissioner and city engineer both testified that they then believed that the high-water conditions might continue for two or three years, and because of their fear that the city might be subjected to the loss of around $400,000 per year, they insisted upon the contractor doing the emergency work at once. It appears that at this time the city council had adjourned until September 11, 1929. Immediately after the conference of July 18 plaintiff in error proceeded to assemble the materials and to construct the cofferdams and flumes, by which the resumption of the work was accomplished and the entire work under the contract was completed in the latter part of November, 1929. The process used was to divert the sewage by means of flumes and to construct cofferdams across the channel and pump the water out to the necessary level, so that plaintiff in error's workmen could install the

lower fastenings and supports of the dock wall and pour the concrete cap as required by the contract.

There is no question in the record as to the value of the labor and materials furnished, it being undisputed that the reasonable ordinary cost of such labor and materials was in excess of $200,000. The cofferdams and flumes formed no part of the permanent structure of the dock walls but were constructed for the purpose of permitting the dock walls to be built in accordance with the plans and specifications. As the work progressed it was checked and supervised by the city engineer. The items were checked by the city and computed on the basis of the unit prices fixed in clause "O." On July 25, 1929, the commissioner of public works told the president of plaintiff in error that he had prepared a written order for this emergency work as he had promised but that he had been advised by an assistant corporation counsel that the order should be approved by the city council, but that, nevertheless, he, the commissioner, wished plaintiff in error to continue the work on the cofferdams and he would see that it was given the written order.

It appears that on July 30, 1929, the commissioner wrote to the chairman of the finance committee of the city council outlining the losses to which the city would be put but for the construction of the cofferdams, and requested authority for the payment of additional work out of the river-straightening fund. Thereafter the city engineer, at the request of the chief of staff of the finance committee, wrote to the latter committee a complete record of the situation and of what had been done by the city to remedy it. He recommended the payment of $150,000. At a regular meeting of the city council September 25, 1929, the finance committee of that body presented and recommended for passage by the council an order for the payment of this work, not to exceed $150,000. The city council did not then, nor did it thereafter, take any action, either favorable or unfavorable, on this report.

As we have seen, the circuit court entered judgment against plaintiff in error, and that judgment was affirmed by the Appellate Court. Numerous propositions of law were submitted to the trial court, all of which were refused.

Plaintiff in error's position is that the extra work having been made necessary by conditions which neither party could have foreseen, and having been done under the order of the commissioner, the city is liable to pay for it; that the materials furnished and labor done were necessary by reason of unexpected contingencies, and under clause "O" of the contract were to be paid for at the unit prices in that clause specified; that the plaintiff in error was induced by the commissioner to forego its right, under the contract, to an extension of time equivalent to that required for the recession of the water and so gave valuable consideration for the promise of the city to pay for the emergency work; that the commissioner had authority to order the emergency work done at the city's expense and action thereon by the city council was unnecessary, and that in any event the city ratified the commissioner's act, and such emergency work, by accepting the benefits thereof and is now estopped from asserting lack of authority on the part of the commissioner to bind the city. On the other hand, defendant in error argues that the city council did not authorize the building of the cofferdams and flumes at the city's expense but that the contract with plaintiff in error required that the latter furnish the same at its own expense; that the commissioner of public works had no authority to order any extra work done which would increase the expense to the city; that the city never accepted the cofferdams and flumes, and that for these reasons the city is not liable.

The questions in this case involve the construction of the ordinance and the contract. That the work was required by circumstances which could not have been foreseen by either party to the contract is admitted. Nor does

defendant in error deny that under the contract plaintiff in error had a right to such additional time as was required to bring about such recession of the water level as would enable it to perform the work. It is undisputed that the unprecedented height of the water in the winter and spring of 1929 was due to the greatly added flow from Lake Superior into Lake Michigan produced by the action of the United States government referred to. It was therefore not a condition arising from the elements with which plaintiff in error's contract required it to cope.

Nor was this work in any way an alteration of the plans and specifications. In fact, the improvement was completed in exact accord with the plans and specifications. It does not, therefore, come within the provisions of the contract hereinbefore quoted, reserving to the city council the right to determine whether alterations resulting in increased cost to the city shall be made and the amount of such increased cost. The ordinance providing for the improvement not only contracted with the railroad companies to provide for them new ground for their tracks but was in addition an improvement ordinance, which provided for the straightening of the river. It was not merely a contract ordinance with the railroads but likewise an improvement ordinance, under which the contract here involved was let.

Section 8 of the ordinance, in which the powers of the commissioner to bind the city are set out, is as follows: "The city, through the commissioner, shall make, let and enter into any and all contracts necessary for the construction of the proposed new channel, including excavating the same, constructing dock walls and their appurtenances and filling the old channel, and all other physical work of every nature whatsoever involved in or necessary to the alteration of the channel of the river. The cost of the aforesaid work shall be paid by the city." By the third paragraph of section 5 the commissioner "is hereby authorized to elect

and determine which of the aforesaid types of docks or retaining walls shall be used, and it shall not be obligatory to use one and the same type along the entire boundary of the said new channel, provided, however, that the type selected by the commissioner in each instance shall be the type which, according to good engineering practice, shall be adapted to the location where it is to be placed." Section 29 provides that the work shall be done under the supervision and control of the commissioner, subject to the requirements of the permits granted by the United States and the State of Illinois. Section 30 is as follows: "Whenever the provisions of this ordinance have to do with the manner of carrying out of its terms and conditions, or have to do with the priority of its terms and conditions, the execution of the same or the priority of construction work hereunder, or have to do with the administration of anything herein contained, the commissioner, in his discretion, may make such change or adjustments as to all matters ministerial as will in his judgment best facilitate the carrying out and execution of the provisions of this ordinance." By section 37 it is declared that the provisions of the ordinance are to be interpreted and applied so as to fully and completely carry out the purposes thereof. It is also provided: "All things not merely convenient but actually necessary to carry out the express terms and provisions of this ordinance shall be taken and considered as herein implied and authorized, as fully as if they had been expressly stated." It is clear from these provisions of the ordinance that plenary power was given to the commissioner to make all contracts necessary and to determine all questions of dispute arising thereunder. No limitation is placed on that officer nor requirement that his acts be first approved by the city council.

Counsel for plaintiff in error argue that as it was provided in the specifications, which were made a part of the contract, that when delay was occasioned by the city or

resulted from other causes over which the contractor had no control, it was to be granted an extension of time equal to such delay, plaintiff in error was entitled to wait for the subsidence of the water level and to use the necessary additional time, not exceeding the extent of such delay, to complete its contract, and that as the commissioner and engineer for the city, because of the very heavy cost to the city in interest and damages, amounting to more than $400,000 per year, were anxious to avoid that delay, the emergency work was by agreement to be done, was for the benefit of the city and it should pay therefor. On the other hand, counsel for defendant in error earnestly argue that this emergency work was of a character required of plaintiff in error under the contract entered into. Quite aside from the benefit to the city, the additional materials and labor furnished on these flumes and cofferdams were required, as we have seen, by an unexpected contingnecy which arose during the progress of the work. It was necessary to use them in order that the work be done in accordance with the contract. We cannot agree that it was work which the contractor was required to do at its own expense, but, on the other hand, are of the opinion that such materials and labor were, under the circumstances here present, authorized by clause (O) of the contract and were by that clause to be paid for by the city on the unit prices there specified. The furnishing of the materials and labor to construct these flumes and cofferdams was therefore not of a character required of plaintiff in error by the contract, but the contract, on the other hand, required that the city meet the expense thereof.

Counsel for the city say that the city did not accept the cofferdams and flumes because they were not a part of the work but accepted only the dock walls and the excavation provided for by the terms of the contract. This argument approaches quibbling. Of course, the city did not accept the necessary labor and materials as such. The physical

structure accepted was the finished product, but the use of the cofferdams and flumes, the material and labor, and all that went into them, was the means of bringing about the finished product. The city, by standing by and without objecting permitting this work to be done and accepting the benefits of that work, must be held to have ratified it. Ratification may be proved by circumstances or inferred from acquiescence after notice. (*American Car Co.* v. *Industrial Com.* 335 Ill. 322.) It was long ago said by this court: "If one sees another doing work for him beneficial in its nature and by his agent overlooks the work as it progresses and does not interfere to forbid it, the work itself being necessary and useful, and appropriates the work to his own use, he might be liable on an implied promise to pay the value of the work." (*DeWolf* v. *City of Chicago,* 26 Ill. 443; *Maher* v. *City of Chicago,* 38 id. 266.) A municipality may be estopped to defend that its agents were without power to make a contract when the facts show that such municipality has accepted the benefits of that contract, where the contract is such as the municipality was empowered to make. (*McGovern* v. *City of Chicago,* 281 Ill. 264; *People* v. *Spring Lake Drainage and Levee District,* 253 id. 479.) We are convinced that either under the common counts, which have been fully proved and not disputed, or under the contract made by the commissioner of public works with plaintiff in error, the latter is entitled to judgment for the value of that work in the amount claimed.

Counsel for plaintiff in error also urge that the court erred in refusing propositions of law presented to it. Under the views expressed in this opinion it is unnecessary to discuss those contentions or other points raised.

We are of the opinion that the plaintiff in error is entitled to judgment for $150,000 on this record and that it was error to refuse to enter judgment for that amount. The Appellate Court accordingly erred in affirming the judgment of the circuit court.

Since there is no question as to facts and nothing in the record requiring a re-trial of the cause, the judgments of the circuit and Appellate Courts are reversed and judgment is entered here for plaintiff in error for $150,000 and costs.

*Judgments reversed and judgment here.*

Mr. JUSTICE SHAW, dissenting:

It will be noted that the contract upon which recovery is sought in this case contains two clauses which must be construed together and neither one of which may be ignored. These clauses are as follows:

"The right is reserved to the city of Chicago, through its commissioner of public works, to make alterations in the plans or specifications for the work included herein. Should it become proper or necessary, however, in the execution of the work, to make any alterations which will increase the expense, said commissioner of public works shall report to the city council the nature of such alterations and his estimate of the amount by which the expense to the city should be thereby increased. The amount by which the contract price shall be increased in consequence of such alterations shall be determined by the city council."

"It is expressly understood and agreed that no payment shall be made to said party of the first part for any extra work or material or of any greater amount of money than is herein stipulated to be paid, unless some changes in or additions to the contract requiring additional outlay by said party of the first part shall first have been expressly authorized by the city council of the city of Chicago and ordered in writing by said commissioner of public work."

The first clause, which reserves the right to the city to make alterations, applies specifically to "plans or specifications for the work included herein." It cannot be applied to any other work than that included in the plans and specifications without construing something into the contract which is not written there. It then goes on to provide that

in the event of alterations being necessary the matter should be reported to the city council, and the following clause provides quite definitely and specifically that no changes or additions shall impose further liability upon the city unless expressly authorized by the city council. The opinion of the majority seems to ignore the plain intent and meaning of these two clauses in the contract and proceeds to fix liability upon the city upon a basis of unit prices set forth in clause "O" of the contract. There are several reasons why this should not be done. In the first place, clause "O" is limited by its own terms to work covered by the specifications, and, as above pointed out, this work is not within the specifications. In the second place, the bill of particulars on file discloses that there were materials to the extent of $147,727.77 put into the Roosevelt road dam and the Thirteenth street dam which are not specifically covered by any sub-paragraph of clause "O." These items consist of steel sheeting, excavating and dredging. This construction is further refuted by the theory upon which the case was tried—*i. e.*, a theory of the making of a separate and distinct ancillary contract, which it was clearly beyond the power of the commissioner of public works to make. This theory was carried not only through the trial but through the original opinion of this court filed herein prior to the petition for rehearing. The attorney for the plaintiff in the trial court in his opening statement announced the intention to recover upon a separate contract. It is also apparent from the method of book-keeping and settlement between the parties that a separate contract was intended, because none of this work was charged or paid for in connection with the main contract but all of it was itemized and set up in a separate and distinct account.

It is my opinion that a harassed and bewildered city council may well inquire of us as to where and in what language it may seek for safety for the tax-payers' money in the making of public contracts if provisions as plain

and free from ambiguity as those in this contract are to be overlooked or so construed as to impose an added liability. In fact, it might well be feared that this opinion will incite some minds to exercise ingenuity so as to leave such possibilities open under future contracts.

Mr. JUSTICE DeYOUNG, also dissenting.