Welsbach Traffic Signal Company, Appellant, v. City of Chicago, Appellee.

Gen. No. 43,300.

Opinion filed April 11, 1946. Rehearing denied May 15, 1946. Released for publication May 16, 1946.

DAVID JETZINGER, of Chicago, for appellant.

BARNET HODES, Corporation Counsel, for appellee; J. HERZL SEGAL and SYDNEY R. DREBIN, Assistant Corporation Counsel, of counsel.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

This action was brought by Welsbach Traffic Signal Company against the City of Chicago to recover $19,965.07, the alleged cost of material and labor furnished by plaintiff to defendant. The case was tried without a jury and at the conclusion of plaintiff's evidence the court on defendant's motion found the issues against plaintiff and entered judgment in favor of defendant for costs. Plaintiff appeals.

From 1928 to and including 1940 plaintiff had maintained and serviced curb flashing and loading zone signal lights for the city under written contracts executed each year. On many occasions during said period the yearly contract was extended into the succeeding year by authority of the city council of the city of Chicago.

On May 16, 1940 the plaintiff entered into such a contract with the defendant through its commissioner of public works for the period commencing on said date and ending December 31, 1940. This contract provided that the commissioner of public works reserved the right to extend the term of the contract beyond December 31, 1940 by authority of the city council of the city of Chicago for a total period of not to exceed six months. Pursuant to council order the contract was extended to April 30, 1941. Sometime prior to April 30, 1941 the city council directed that beginning May 1, 1941 the servicing, maintaining and repairing of street traffic signals and loading zone signals be performed by the city of Chicago.

The following letter was received by plaintiff on May 2, 1941:

"April 30, 1941

"Gentlemen:

"This is to notify you that Contract No. 12595 between the City of Chicago and the Welsbach Traffic Signal Company for installing, servicing, maintaining and relocating curb flashing signals and loading zone signals which has been extended by action of the City Council to April 30, 1941, has expired.

"All work in connection with the contract will be fulfilled by the City from the expiration date of the contract.

Very truly yours,
O. E. Hewitt,
Acting Commissioner of Streets & Electricity.
Joseph J. Butler,
Superintendent of Streets.
P. J. Donovan,
Deputy Superintendent of Streets.
Leslie J. Sorenson,
City Traffic Engineer."

On May 2, 1941 plaintiff wrote a letter to Oscar E. Hewitt, Acting Commissioner of Streets and Electricity of the city of Chicago, which, after quoting the foregoing letter, stated in part:

"In connection with the above quoted letter, we call your attention to several things, namely:

"In the matter of the performance of the work contemplated by the contract mentioned in the letter, the Department of Streets and Electricity, Bureau of Streets, has heretofore in 1941 called for bids for the performance for the current year 1941 of the work covered by said contract. Pursuant to such calling for bids, Welsbach Traffic Signal Company submitted to you a bid covering such work for the current year 1941; said bid was accompanied by certified check in

accordance with the procedure prescribed by your Department. That bid has never been accepted or rejected, and our proposal and the check are still in your hands.

"Further, as above stated, the letter quoted was not received until 8:50 this morning, May 2nd, and at the time of its receipt the maintenance crews of the Welsbach Traffic Signal Company involved in this work were necessarily on the street in the performance of their duties, and at this time these crews are so engaged and the members thereof are, of course, employees of our Company.

"From a practical standpoint it is obvious that Welsbach Traffic Signal Company cannot call in its crews and discontinue its maintenance work without seriously affecting the operation of the safety service involved. If the City of Chicago, through your Department, still has under consideration the said bid of our Company for maintenance during the current year, it is again obvious that our Company must maintain its organization and be ready to perform if the said bid is accepted by the City of Chicago.

"Welsbach Traffic Signal Company asks immediate written instructions from your Department as to whether or not your Department orders it this day to discontinue all work and service in the matter of the maintenance involved in its work covered by the contract mentioned in your letter above quoted and to no longer hold itself in readiness, notwithstanding that no action has been taken on the pending bid of the Company for 1941.

"Further in this connection, we note that only this day is the City opening bids covering the furnishing of materials and supplies essential to the performance of the service heretofore and now being performed by our Company.

"In light of the nature of the service involved in its relation to public safety, our Company, regardless

of its own interests and rights in the premises, is reluctant to abruptly discontinue its service when by so doing public safety may be jeopardized. Having these things in mind, our Company feels that its above request is not only justified, but demanded.

"Awaiting your reply,

Very truly yours,

Welsbach Traffic Signal Company,

By Morse Dell Plain,

President."

The city did not reply to plaintiff's letter and the latter ·continued to service· defendant's safety signal lights until June 10, 1941.

When the city council directed that the city itself service, maintain and repair its safety signal lights commencing on May 1, 1941, it made an appropriation to cover the cost of this work by the city but during the period from May 1, 1941 to and including June 10, 1941 the commissioner of streets and electricity did not possess the materials and equipment necessary for the performance of such work.

Leslie J. Sorenson was the city traffic engineer and his office had supervision of the work performed by plaintiff and the approval of bills rendered by it for its services during the years it did this work under written contracts authorized by the city council. Mr. Shobe was an assistant traffic engineer employed under Sorenson and he was in immediate charge of plaintiff's dealings with the city under its contract for 1940 as extended to 'April 30, 1941. During the period from May 1, 1941 until June 10, 1941 plaintiff· continued to mail or deliver statements to Shobe showing the labor and materials furnished in servicing and maintaining the city's safety signal lights and made daily reports to him of repairs· to signal lights which had been damaged by automobiles. Other employees in the office of the traffic engineer secured information from plaintiff as to the cost of said repairs

and the city, whenever possible, collected same from the owners of the automobiles who had caused such damage and appropriated the money thereby collected to its own use.

Otis L. West, plaintiff's assistant secretary and office manager, testified that sometime between June 20 and June 25, 1941 he asked Shobe if he had the bills rendered to the city for the services involved herein and that Shobe said that he had but that ''He had no account to charge them to.' He asked me if I would take them back, they were in his way. So I did take them back to the office.''

Plaintiff spent $19,965.07 from May 1 to June 10, 1941 for labor and materials in servicing the city's safety light signals, in repairing damaged signals and in relocating signals where street widenings had been completed. All of this work was reported to Shobe during said period. The city did not service, maintain or repair any of its safety signal lights prior to June 11, 1941.

Plaintiff contends that defendant is liable on an implied contract to pay for the labor and materials furnished on the theory that if one has knowledge that another is doing work for him, beneficial in nature, and does not interfere to forbid it, the work itself being necessary and useful, and appropriates the work to his own use, he is liable on an implied promise to pay the value of the work and that municipal corporations as well as private corporations and natural persons are bound by the principles of common honesty and fair dealing.

Defendant's theory as stated in its brief is that ''the trial court properly entered judgment for the defendant on its motion for judgment at the close of the plaintiff's evidence because: (1) the plaintiff failed to prove either an express or implied promise on the part of the city to pay for the labor and material fur-

nished by the plaintiff and (2) under the law in the State of Illinois the plaintiff cannot recover because it failed to prove that there was a valid contract in full force and effect from May 1, 1941 to June 10, 1941, authorized by the city council of the City of Chicago.''

There are two questions presented for our determination. The first is whether under the facts and circumstances in evidence a promise will be implied on the part of the city to pay plaintiff for the labor and material furnished by it to the defendant from May 1, 1941 to June 10, 1941 and the second is whether plaintiff can in any event recover from the city on an implied contract.

In considering the first question it should be stated at the outset that we are mindful of the rule that one man cannot make another his debtor without his consent or render services without his request and thereafter compel payment for such services. However, we think that the circumstances under which the services were rendered in this case brings it within a well recognized exception to said rule.

Plaintiff's contract relations with the city were abruptly terminated on April 30, 1941. It was notified by the appropriate city officials that thereafter the city would perform the services theretofore rendered by plaintiff under its written contract. It is a matter of common knowledge that the city had expended millions of dollars to install safety signal lights throughout the city of Chicago to aid in the prevention of accidents. When the defendant notified plaintiff that the city itself was going to service, maintain and repair the safety signal lights commencing May 1, 1941, the responsible officials of the city knew, as did plaintiff, that the city did not have the materials or the equipment with which to perform this work. As soon as plaintiff received the aforesaid notice from the city it realized that an emergency

existed because the defendant, which was charged with the duty of keeping its safety signal lights in working order, was not able to perform this duty at that time.

Immediately upon its receipt of the city's notice on May 2, 1941, plaintiff wrote the letter, heretofore set forth, to the commissioner of streets and electricity advising him of the existence of the emergency, as the result of which the public safety would in all likelihood be jeopardized, and stated in said letter that: "Welsbach Traffic Signal Company *asks immediate written instructions from your Department as to whether or not your Department orders it this day to discontinue all work and service in the matter of the maintenance involved in its work ordered by the contract mentioned in your letter above quoted and to no longer hold itself in readiness,* notwithstanding that no action has been taken on the pending bid of the Company for 1941." (Italics ours.)

As already stated, the commissioner of streets and electricity did not reply to this letter. It is fair to assume that, knowing that the city did not have the materials or equipment necessary to do the work and that it was essential that the safety signal lights be kept in working order, the commissioner of streets and electricity simply elected not to answer the plaintiff's letter but to let it continue to service and repair the safety signal lights until the city was prepared to do the work itself. It will be noted that the city's notice to plaintiff did not order it to discontinue the work and plaintiff was not ordered to discontinue the work at any time prior to June 10, 1941. After the expiration of its contract on April 30, 1941 plaintiff had continued doing this work on May 1 and May 2, 1941, prior to its receipt of defendant's notice, and the emergent situation pointed out in plaintiff's letter of May 2, 1941 to the commissioner of streets and electricity justified plaintiff's demand that it be given "immediate written instructions" by said commis-

sioner, if he desired it to discontinue said work. In our opinion the failure of the commissioner of streets and electricity to give such instructions constituted an implied invitation to plaintiff to continue doing this necessary work until the city was equipped to perform it.

It is idle to urge that the defendant had no knowledge that the plaintiff was servicing the safety signal lights during the period from May 1, 1941 to June 10, 1941. Shobe, the assistant traffic engineer, had direct knowledge of the performance of this work by plaintiff and in the absence of evidence to the contrary, it may be reasonably inferred that he performed his duty and reported the fact that plaintiff was doing this work to his superior, Sorenson, the city traffic engineer. Furthermore, in view of the facts and circumstances in evidence it is absurd to claim that the commissioner of streets and electricity did not have knowledge that plaintiff was servicing the safety signal lights during the period involved herein.

The city did not perform or attempt to perform any work in connection with keeping its safety signal lights in working order until June 11, 1941. The city council made an appropriation for the performance of this work by the city but not one cent of this appropriation was expended by the city for servicing its safety signal lights from May 1, 1941 to June 10, 1941. That the city notified plaintiff that its contract expired April 30, 1941 and that thereafter the defendant was going to service the safety signal lights itself is inconsequential, in view of the fact that the city did not perform this work from May 1, 1941 to June 10, 1941 and in view of the further facts that defendant knowingly permitted plaintiff to perform this necessary work during said period, made no objection to such performance, did not interfere to forbid it and accepted the benefits thereof. Under the facts and circumstances in evidence the law will imply a promise

on the part of the city to pay plaintiff for the labor and materials furnished by it in servicing defendant's safety signal lights during the period in question.

This brings us to the consideration of the second question as to whether recovery may be had against a municipality on an implied contract.

Pursuant to the power vested in it by the Cities and Villages Act (pars. 44, 65 and 65.1, ch. 24, Ill. Rev. Stat. 1939), the city council of the city of Chicago enacted an ordinance (sec. 26–12 and 26–20 of the Municipal Code of Chicago), the pertinent portions of which are as follows:

"Section 26–12. All purchase orders or contracts involving an expenditure of more than five hundred dollars in amount shall be let to the lowest responsible bidder, after advertising for bids as hereinafter provided, and shall be approved by the mayor and countersigned by the comptroller.

"No contract involving an expenditure of more than five hundred dollars shall be made unless the same shall have been authorized by the city council."

"Section 26–20. All contracts exceeding five hundred dollars shall be executed in triplicate, by the commissioner of public works on the part of the city, and by the contractor.

"No contract shall be binding upon the city, nor shall any work contracted for be commenced, or any materials or supplies be delivered thereunder, until such contract has been duly executed."

Defendant insists that plaintiff is precluded from recovery because it "failed to prove there was a valid and existing contract between the plaintiff and the defendant, authorized by the City Council of the City of Chicago," as required by the provisions of the foregoing city ordinance.

Plaintiff asserts that municipal corporations as well as private corporations and natural persons are bound by principles of common honesty and fair dealing and

that if its implied contract with the city is not enforcible the defendant would thereby be permitted to obtain an unconscionable advantage over it.

In the early case of *Maher v. City of Chicago*, 38 Ill. 266, the plaintiff contractor brought an action in assumpsit against the city of Chicago to recover for labor performed in dredging a portion of the Chicago river in connection with a project of the city to deepen and widen said river. The dredging was done by plaintiff at the instance of the then Mayor of Chicago and pursuant to an understanding between the mayor and the Committee on Harbors and Bridges of the City Council and plaintiff that the latter would be paid for his work when a special assessment should be made and collected for paying the expenses of the improvement. Thereafter the city council ordered that the project be completed and paid for by special assessment (including the work performed by plaintiff). However, the Supreme Court in *Wright v. City of Chicago*, 20 Ill. 252, held that said special assessment was invalid and that the city had no power under its charter to make a special assessment for the purpose of deepening the river. The city thus having failed to derive the means of payment from the source whence they were expected, refused to pay plaintiff for the work done by him. In that case, although no written contract was entered into between the city and plaintiff for the performance of the work which he had done and no such contract was authorized by the city council, the court held that "the record discloses a state of facts from which the law implies a contract on the part of the city to pay for the value of the work performed." There the court also said: " 'If,' said this Court, in *De Wolf v. City of Chicago*, 26 Ill. 446, 'one sees another doing work for him beneficial in its nature, and, by his agent, overlooks the work as it progresses, and does not interfere to forbid it, the work itself being necessary and useful, and appro-

priates the work to his own use, he might be liable, on an implied promise, to pay the value of the work.' Chancellor Kent says, in the second volume of his Commentaries, page 291, 'that corporations can be bound on implied contracts, to be deduced by inference from corporate acts, without either a vote, deed or writing, is a doctrine generally established in the Courts of the several States with great clearness and solidity of argument.' We do not understand the counsel for the City as denying these principles to be correct legal propositions.''

The latest expression of the Supreme Court on the question as to whether a municipality may be bound on an implied contract is found in *Great Lakes Dredge & Dock Co. v. City of Chicago*, 353 Ill. 614. In that case the city council of the city of Chicago adopted an ordinance for straightening the south branch of the Chicago River. The ordinance provided for altering that stream between Polk street on the north and West Eighteenth street on the south by excavating a new channel 200 feet in width and about 26 feet in depth for a distance of about 5000 feet, the construction of dock walls along the banks and filling in the old channel of the river with earth. The ordinance authorized the commissioner of public works to make any and all contracts necessary for carrying out the improvement. On August 8, 1928, pursuant to the ordinance, the commissioner of public works entered into a written contract with plaintiff for cutting the channel and constructing the dock walls. The cost of the work to be done under this contract was approximately $2,700,000. Plaintiff proceeded promptly with the work and by May 28, 1929, had excavated the greater portion of the new channel and had driven substantially all of the piling for the dock walls but considerable work remained to be done by way of capping the pilings by a cap of concrete seven feet in thickness and seven and one half in width, the con-

crete cap to extend about two and one half or three feet below the surface of the water in the channel and to be anchored to the piling. In the spring of 1929 the water in the river had risen three and one half to four feet higher than its normal level due to an abnormal increase in the height of the water in Lake Michigan. Due to the unprecedented rise in the level of the river it became impossible for plaintiff to proceed with capping the dock walls. The plaintiff contractor reported the emergency to the commissioner of public works and advised him that it would have to discontinue the work under its contract until the water receded. The commissioner of public works directed plaintiff to build cofferdams and flumes so that it might finish the work under the contract and agreed that the city would pay the additional costs thereby incurred. Thereafter the city refused to pay plaintiff the cost of erecting the cofferdams and flumes. Although the commissioner of public works promised to give plaintiff a written order for the emergency work, he did not do so upon the advice of an assistant corporation counsel. There was no city council authorization for the construction of the cofferdams and flumes in that case nor was there any written contract between the Great Lakes Dredge Co. and the city covering that work. There, in addition to holding that under its construction of the written contract between the parties the plaintiff contractor was entitled to recover $150,000 from the city for the work performed by it by reason of the emergency caused by the unprecedented rise in the level of the river, the Supreme Court said at pp. 626 and 627:

"Counsel for the city say that the city did not accept the cofferdams and flumes because they were not a part of the work but accepted only the dock walls and the excavation provided for by the terms of the contract. This argument approaches quibbling. Of course, the city did not accept the necessary labor and

materials as such. The physical structure accepted was the finished product, but the use of the cofferdams and flumes, the material and labor, and all that went into them, was the means of bringing about the finished product. The city, by standing by and without objecting permitting this work to be done and accepting the benefits of that work, must be held to have ratified it. Ratification may be proved by circumstances or inferred from acquiescence after notice. (*American Car Co. v. Industrial Com.*, 335 Ill. 322.) It was long ago said by this court: 'If one sees another doing work for him beneficial in its nature and by his agent overlooks the work as it progresses and does not interfere to forbid it, the work itself being necessary and useful, and appropriates the work to his own use, he might be liable on an implied promise to pay the value of the work.' (*De Wolf v. City of Chicago*, 26 Ill. 443; *Maher v. City of Chicago*, 38 id. 267.) A municipality may be estopped to defend that its agents were without power to make a contract when the facts show that such municipality has accepted the benefits of that contract, where the contract is such as the municipality was empowered to make. (*McGovern v. City of Chicago*, 281 Ill. 264; *People v. Spring Lake Drainage and Levee District*, 253 id. 479.) We are convinced that either under the common counts, which have been fully proved and not disputed, or under the contract made by the commissioner of public works with plaintiff in error, the latter is entitled to judgment for the value of that work in the amount claimed.''

Of course, ordinarily city officials and persons dealing with them are bound by the restrictive provisions of the ordinance, heretofore set forth, but it seems clear from the foregoing cases that in furtherance of justice and where the exceptional facts and circumstances of a case demand it, the law will imply a contract on the part of a city to pay for services rendered to it.

We have examined and considered the numerous other authorities cited by the parties but in the view we take of this case we do not deem it would serve any useful purpose to discuss them.

██ We are impelled to hold that the trial court erred in sustaining defendant's motion to find the issues in its favor at the conclusion of plaintiff's evidence and in entering judgment against plaintiff for costs.

For the reasons stated herein the judgment order of the circuit court of Cook county is reversed, including its finding that plaintiff did not make out a prima facie case, and the cause is remanded with directions that defendant present a defense if it so desires and that such further proceedings be had as are not inconsistent with the views expressed herein.

*Judgment order reversed and cause remanded with directions.*

FRIEND, P. J., and SCANLAN, J., concur.